## GREER v. WHITE.

Opinion delivered April 5, 1909.

1. LIBEL AND SLANDER—MEANING OF WORDS.—In an action for slander it is immaterial what meaning the defendant intended to convey by the language used if the words complained of are in fact slanderous according to their plain and proper sense. (Page 120.)

2. SAME—CHARGE OF BURNING HOUSE.—An allegation that defendant burned down plaintiff's house amounted to a charge that defendant committed arson, and is slanderous. (Page 121.)

3. SAME—EXEMPLARY DAMAGES—NEGLIGENCE.—As the injury which will justify an award of exemplary damages must result from a wilful wrong or from a conscious indifference to results which amounts to malice, a defendant is not liable for exemplary damages where he was guilty of slandering the plaintiff under a mistaken belief that he was another person. (Page 122.) ·

Appeal from Jefferson Circuit Court; *Antonio B. Grace,* Judge; reversed in part.

*White & Altheimer,* for appellant.

1. There is no case here for punitive damages. No ill feeling or malice is shown, no wanton, willful and gross negligence. 84 Ark. 241; 56 Ark. 609; 39 Ark. 393; 67 Ark. 388; 53 Ark. 10; 80 Ark. 262; 77 Ark. 114; 41 Ark. 297; 88 Ark. 200. If entitled to recover at all, appellee ought to recover compensatory damages only. 39 Ark. 387.

2. The court erred in instructing the jury as a matter of law that the use of the words "he burnt my house down" amounted to charging the appellee with the crime of arson. One may burn a house down and still not be guilty of arson. Kirby's Dig. § 1575. If the words used were susceptible of two constructions, one to charge arson and the other not, the question what appellant meant and what the hearers understood should have been left to the jury. 13 Enc. of Pl. & Pr. 106; 79 C. C. A. 413; 55 C. C. A. 555; 56 Ark. 102.

*Bridges, Wooldridge & Gantt, Taylor & Jones,* and *Daniel Taylor,* for appellee.

1. The instruction as to punitive damages was proper under the evidence in this case. 94 Fed. 762; 47 S. W. 226; 49 S. W. 15; 54 S. W. 304; 11 S. W. 1058; 78 Fed. (C. C. A.) 769; 15 Fed. 371; 16 L. R. A. 803; 26 L. R. A. 531; 2 C. C. A.

354; 1 U. S. App. 296; 55 Fed. 240; 130 Fed. 944; 137 Fed. 723; 55 L. R. A. 732; 25 Cyc. 536.

2. The words used in effect charged appellee with the crime of arson, and were slanderous *per se.* Townshend on Libel & Slander, § 139. They are to be taken in their natural and obvious meaning, the test being what would a man of ordinary understanding infer from such words. 102 Ill. App. 162; Kirby's Dig. § 1856; 55 Ark. 498; 1 Cowp. 272; 25 Cyc. 355, 357-9. It is for the court first to decide whether the words used are reasonably capable of two meanings, then, if it so decides, it is for the jury to decide which meaning was intended. Newell on Slander, § 16. The words here used are not ambiguous. 33 Am. Rep. 277; 2 *Id.* 526; 3 Port. (Ala.) 442; 1 Bibb (Ky.) 593; 3 Rich. (S. C.) 242; 4 Ga. 364; 3 Harr. (Del.) 77; 30 Conn. 80.

McCulloch, C. J. Plaintiff, H. S. White, instituted this action against defendant, G. B. Greer, to recover damages on account of alleged slanderous words spoken about him in his presence and in the presence of others. The words were spoken in response to a request made by a Mr. Core for permission for the plaintiff to ride in a conveyance with defendant, and are as follows: "No, sir; no such man as that can ride with me at all. He burnt my house down. I shot him out of my house once. Let him walk to town—let him mud it."

It is alleged in the complaint that the defendant in speaking the words meant that the plaintiff had committed arson in burning the defendant's house, and that such charge was false. The circumstances under which the words were spoken are about as follows: Plaintiff lived at England, in Lonoke County, and the defendant lived at the city of Pine 'Bluff. The latter owned a plantation near England, and on the day of this occurrence had come to England on the train and driven out to his farm in a two-seated vehicle with a Mr. Cobb. Mr. Core also owned a farm in the same locality, and on the day in question the plaintiff, a driver for a liveryman in England, carried Core and a Mr. Rose out to the farm in a buggy. The parties met at one Kaufman's store, which is also in the same neighborhood. When they were ready to return, Core requested Cobb, who was in the

conveyance with defendant, to let the plaintiff ride back with them, whereupon the defendant spoke the words referred to concerning the plaintiff, in the presence of those assembled there. Plaintiff was standing within twelve or fourteen feet of the vehicle in which defendant was seated when the words were spoken, and testified that he heard them and felt greatly humiliated thereby. He testified that after they got back to England he approached defendant and asked him why he had made use of the insulting language; that defendant, who was standing with one foot on the step of the train in the act of boarding it, merely replied, "I don't want to talk to you." He also testified that he met the defendant about six months before that time, and bought some goods from him; that there had never been any ill feeling between them; that he had never done anything to defendant, and knew of no reason why defendant should speak to him or about him in that way. There was no other evidence tending to show any malice or ill feeling on the part of defendant toward plaintiff.

Defendant testified that he was not acquainted with plaintiff, had never seen him before, and that when he made the remark he thought he was speaking about a man named Locke, with whom he was slightly acquainted, and who had done him great injury. He gave the following account of his alleged trouble with Locke, which he said he had reference to when he made the remark in question: "There was a fellow named Locke who worked on the levee on my place, and there was a little old cabin that they were to tear down, and I told them not to tear it down, and we agreed that I was to move it if it had to be moved, and I told him he must not tear it down, and they brought the horse up there and put a rope around the shed room and pulled it down, and it made some racket, and they then put it around the farm house, and I told them to stop it—that I had already sent up here to get a restraining order. Well, after I went out in front of the house and motioned for them to get out. They all ran out, and I shot bird shot in the door, and then I went to the postoffice, and after a while a couple of young men went by and said there was a big smoke over there, but they did not stop. I saw the house was burning up, and I went down there. It was a little cabin. A negro woman lived in it, but they

had moved her things out, and when I undertook to investigate the matter they said the chimney pulled down, and it might have caught fire from that. * * * It never struck me that anybody burnt it; only that it caught from the chimney. I never thought of having anybody arrested. The little old cabin wasn't worth very much. They pulled down part of it, and then it was burnt, and that was all there was to it."

There was also evidence which tended to show that plaintiff did not resemble Locke at all. The jury returned a verdict in favor of plaintiff for $500 compensatory damages and $500 exemplary damages.

The court instructed the jury that the words spoken by defendant to and concerning the plaintiff charged the latter with the crime of arson, and were slanderous *per se* and actionable. This instruction is assigned as error.

Mr. Newell says that "The rule which once prevailed that words are to be understood *in mitiori sensu* has been long ago superseded; and words are now to be construed by courts, as they always ought to have been, in the plain and popular sense in which the rest of the world naturally understand them." Newell on Slander & Libel, p. 304. See to the same effect 25 Cyc. 355, and cases cited.

The following statement, which seems to be well sustained by authority, is made on this subject: "Defamatory language must be interpreted as it would be understood by the reader or hearers, taking into consideration accompanying explanations and the surrounding circumstances which were known to the hearer or reader." 25 Cyc. 357. This implies that attending circumstances not known to the hearers are not to be considered in determining whether or not the words spoken are slanderous in themselves. It is immaterial what meaning the speaker really intended to convey by the language used if the words spoken are in fact slanderous. "If a man in jest," says Mr. Newell, "conveys a serious imputation, he jests at his peril. Or he may have used ambiguous language which to his mind was harmless, but to which the bystanders attributed a most injurious meaning. If so, he is liable for the injudicious phrase he selected. What was passing in his own mind is immaterial, save

in so far as his hearer could perceive it at the time." Newell on Slander & Libel, p. 301.

Now, the real question in the case is whether or not the words used by the defendant to the effect that the plaintiff had burnt his house down amounted, in their common acceptation, to the charge of having committed the crime of arson. We think that they do, and that the learned circuit judge was correct in so informing the jury. This language is ordinarily susceptible of no other meaning, and it would be a strained construction of it to say that it merely meant that the person spoken of had, by his negligence or inadvertence caused the destruction of the house by fire. The words, when considered in their ordinary acceptation, are not even ambiguous; and the ordinary hearer would not understand them as meaning anything except that a charge of willful burning was intended.

An early case in Kentucky (*Logan* v. *Steele,* 1 Bibb 593) is very much in point. There the defendant said about the plaintiff, "I have every reason to believe he burnt said barn." The court held the language to be slanderous *per se,* and in the opinion said: "It is now settled that words are to be taken in that sense in which they would be understood by those who hear or read them. The judge will neither torture them into guilt nor explain them into innocence, but take them in their usual acceptation, and understand them according to their obvious import and meaning. Tested by this doctrine, the words in question are clearly actionable. They carry with them an evident imputation of guilt, and it requires the most forced and far-fetched construction to give them an innocent meaning." The following cases are also closely in point, and sustain the views herein expressed: *Tuttle* v. *Bishop,* 30 Conn. 80; *Naylor* v. *Ponder,* (Del.) 41 Atl. 88; *Frank* v. *Dunning,* 36 Wis. 270.

In the last cited case the defendant accused plaintiff of burning his own house, without stating the purpose for which it was done; and the court held that, without averment that the house was insured and that the burning was done with the intent to defraud the insurance companies, the charge implied no unlawful act. The reasoning of the court, however, clearly indicates that, if the charge had been that of burning the house

of some one else, these words in their ordinary acceptation would have amounted to a charge of arson.

The jury might well have found that the defendant in this case did not really intend to make a charge of arson against the plaintiff, whom he took to be Locke, but merely that the house was burned by reason of negligence of Locke. These circumstances, however, were unknown to the plaintiff and the other hearers, and they could not have understood the language otherwise than as meaning a charge of arson.

The court, at the request of plaintiff, gave the following instruction: "Although you should find that defendant, when speaking to or of plaintiff, believed him to be another person, yet if you find that defendant made the statements alleged by plaintiff, and that they were false as to him, and that he exercised so little care to know or ascertain that plaintiff was the person concerning whom he intended to make such statements as to show a reckless and wanton disregard of plaintiff's rights, feelings and reputation, then you may award plaintiff punitive damages, as well as if the statements had been made by defendant through actual malice toward plaintiff."

The effect of this instruction was to tell the jury that, notwithstanding the fact that the defendant believed at the time that he was speaking to or concerning Locke, yet, if he was guilty of gross negligence in reaching that conclusion as to the identity of the two men, a verdict for exemplary damages would be justified. This court has heretofore announced and steadily adhered to the rule that mere negligence, however gross, will not justify the infliction of exemplary damages. The injury must result from a willful wrong or, what is its equivalent, conscious indifference to results, before such damages should be awarded. *Railway Co.* v. *Hall,* 53 Ark. 7; *St. Louis, I. M. & S. Ry. Co.* v. *Stamps,* 84 Ark. 241; *St. Louis, I. M. & S. Ry. Co.* v. *Dysart,* 89 Ark. 261.

Now, if the defendant honestly believed, as recited in this instruction, that he was speaking to or about Locke, then his conduct, so far as plaintiff is concerned, could not at most have amounted to more than gross negligence. Therefore it did not call for infliction of anything more than compensatory damages. But, even if the instructions in this case had been correct, we are

ot the opinion that the evidence did not sustain a finding of such elements as would justify infliction of exemplary damages. There is not a particle of proof that the defendant entertained any actual malice or ill will towards plaintiff, nor any circumstances from which that could be inferred. The evidence is undisputed that there was a very slight acquaintance, if any at all, between the two men, and that nothing of an unpleasant nature had ever occurred between them. It is manifest that it was purely a mistake on the part of the defendant in confusing the identity of the plaintiff with some other man, for there was nothing in the attending circumstances which called for an insulting remark from a mere request on the part of Core for the plaintiff to be allowed to ride in the vehicle with defendant.

The judgment as to compensatory damages will be affirmed, there being no error in the record as to this part of the recovery, but the judgment for exemplary damages will be reversed, and the case as to that feature will be dismissed. It is so ordered.