BRAMAN AND THE GUS BLASS COMPANY
*v.* WALTHALL.

4-8813                                          225 S. W. 2d 342

Opinion delivered May 30, 1949.

Rehearing denied June 27, 1949.

*Frank J. Wills,* for appellant.

*Frances D. Holtzendorff, Ben D. Rowland* and *Rose, Dobyns, Meek & House,* for appellee.

MINOR W. MILLWEE, Justice. Appellees, Myrna Walthall and Addie Allen, filed separate slander suits against appellants, Gus Blass Company and Don Braman. The original complaints also contained a second cause of action against appellants for restraint of liberty, but the trial court sustained appellants' motion to require appellees to elect, and the second counts were stricken as being improperly joined under § 1283 of Pope's Digest. The original complaints also made three other employees of Gus Blass Co. party defendants, but

appellees dismissed the suits as to two of these and took a non-suit as to the other.

The Gus Blass Co. operates a department store in the City of Little Rock with appellant, Don Braman as its store superintendent. Appellee Walthall entered the employ of the company as cashier in the piece goods department in April, 1945, and appellee Allen was employed as saleslady in the same department in April, 1946.

In their complaints appellees alleged that appellant Braman falsely and maliciously called them "liars", "thieves", "cheats" and "lying thieves" in the presence of each other and in the presence of other employees of the company; that said false and slanderous statements were made with the malicious intent to, and did, expose appellees to public hatred, contempt and ridicule; that said statements were spoken by Braman in an insulting, boisterous and contemptuous manner and by use of vile, obscene and profane language; that by reason thereof appellees suffered physical illness, mental anguish, embarrassment, humiliation and damage to their reputations for which they were entitled to recover both actual and punitive damages.

In their answers appellants objected to the jurisdiction of the court on the ground that the Workmen's Compensation Commission had sole jurisdiction. The answers, as amended, also contained a general denial and alleged the truth of the alleged slanderous statements, if made; that appellees conspired with each other to steal merchandise from the company; and that said slanderous statements, if made, were privileged.

The actions were consolidated for trial and resulted in verdicts and judgments for each of the appellees in the sum of $2,000 compensatory damages and $500 punitive damages.

Appellants first contend that the cases should have been transferred to the Workmen's Compensation Commission because the matters complained of arose out of and in the course of appellees' employment by the Blass

company. Appellants cite no authority to sustain this novel contention and we find it to be without merit. There is nothing in the Workmen's Compensation Law (Initiated Act 4 of 1948) indicating a repeal of our statutes on libel and slander (Ark. Stats. 1947, §§ 41-2401 to 2412). The act provides for compensation to employees for disability or death from accidental injury arising out of and in the course of employment or from occupational disease arising therefrom. We find nothing in the language of the act which could be construed as including slander or damage to character as furnishing a basis for compensation to employees.

It is also insisted that the evidence is insufficient to support the verdicts. According to the testimony of Mrs. Walthall she was called to Braman's office about 4:30 p. m., September 25, 1947, and told that she was $25.87 short in her cash receipts for September 23, the store being closed on September 24. She gave the following testimony as abstracted in appellee's brief: ''The first thing he asked me was if I had a husband and I told him no. Then he started in. He kept me in the store until six o'clock—thirty minutes after closing time. He told me to be back at 9:00 in the morning. I asked him if he was accusing me of taking anything, and he just told me to come back in the morning to get my money. I couldn't get it then—it was all closed. I got in the store at quarter to nine Friday, September 26, and in about ten minutes from then I was in his office back there and he began on me. He had these tickets on his desk and I did not have anything to do with tickets. All I did was stamp tickets. I did not have a sales book. He said 'You took this money and you made a duplicate ticket, leaving off the two dates and putting on these other two. Therefore you stole $11.29, didn't you?' I said, 'No.' He said 'Myrna, don't lie to me.' I said, 'I am telling you the truth', and he called me everything in the world he could. He shook his finger at me and hit me so many times on the end of my nose until there is a mark there. He said I had taken material and I had stolen money from the store to the extent of $5,000. I kept telling him no. I was crying. I tried to leave. He grabbed me by the arm and

pushed me down and said I wasn't leaving. I wanted a drink. I was sick at my stomach. He ordered me not to leave the room—I was to sit there until he finished with me. My arm was black and blue. He would get right up and say 'You little lying thief, you are going to tell me or you are going to pay the price.' I kept telling him I didn't do it, I didn't know who did. He called Miss Cox and told her to start writing. He would stand over me and dictate to Miss Cox. I don't know what all was written. I wasn't permitted to read it. He said I would have to pay the $5,000. He said if I didn't sign the statement he would put me behind bars. He would ask me how I would look behind bars to my little girl to stare at. He picked up the phone to call the bonding company and I started crying harder. . . . He told me if I didn't sign he would follow me and I would be unable to get employment.

"I was afraid of him. He would grit his teeth at me. He called me everything. About 2:00 p. m. he allowed me to get a bowl of soup in the custody of Mrs. Beall. I wasn't allowed to use the telephone. He got up and said I was going to sign that statement. He took hold of my left arm and hit me on the knee with a file board. He said the bonding company would put me in jail. He picked up the phone and said 'Mr. Williams, you have a good case here. I have the goods on her and I want you to go the limit with her.' He was going to have me in jail within three minutes and my daughter could see me only through bars. I did not know the bonding company was in Memphis. He tried to make me say that I took a thousand dollars, then five hundred, and then three hundred. He shook his desk and said, 'Will you say you took anything?' And I said, 'No', and that is why he got so mad."

Mrs. Walthall testified that under these circumstances she signed the typewritten statement without being given an opportunity to read it; that Braman refused to permit her to consult an attorney or call her mother over the telephone; that he called her a thief and lying thief in the presence of three other employees;

that after she signed the typewritten statement, Braman directed two other employees to take witness to her home and search for materials; that said employees took from her home two skirts, a blouse and a few pieces of material, part of which had been purchased by her brother and presented to her as a Christmas present, and the balance of which she herself had purchased; that Braman sent down to her desk and got a box containing a sweater and dress, which she had just paid out of layaway for her daughter, some old shoes and glasses belonging to witness, and some material that had been ordered held for customers until called for; that Braman accused her of intending to walk out of the store with the box; that when she returned with the employees to the store, appellee Allen was in Braman's office and he called both of them lying thieves; that after dismissing Mrs. Allen, he told witness to write a statement in long hand, the contents of which he dictated and that she was forced to sign this statement after Braman used the same tactics that had been previously employed in obtaining the typewritten statement.

Mrs. Walthall further testified that after she signed the statement, Braman said it was no good and that he wanted something better. She was given some paper and told to take it home with her and write out a confession and bring it back the next morning. The following morning witness returned to the store with her brother and challenged Braman to make the same statements in the brother's presence that he had made the day before. When she asked for her check and the things that had been taken from her, Braman ordered her out of his office.

We do not set out the testimony of Mrs. Allen which tended to show the same method of treatment as employed in the case of Mrs. Walthall. Certain material was also taken from Mrs. Allen's home and she testified that she wrote out a statement under circumstances similar to those testified to by Mrs. Walthall. Mrs. Allen's 16 year old daughter who was employed on weekends identified part of the material taken from her

mother's home as having been purchased by her for herself and mother. Both appellees denied that they had ever stolen anything from the store.

A doctor who examined appellees on September 29, 1947, testified that he found them in a nervous, weak and upset condition and that he found two bruises on the right arm of Mrs. Walthall.

Appellees testified of several instances after being discharged by appellants in which they failed to obtain employment after Blass was given as a reference, and of losing jobs obtained without such references after the employer learned of their former employment by Blass.

The testimony on behalf of appellants contradicted that on behalf of appellees on all the material issues. If the jury had believed such evidence, it would have been warranted in finding that the slanderous statements attributed to Braman, if made, were true and made in good faith and without malice; and that appellees made voluntary confessions establishing the truth of the alleged slander. Appellants point out certain discrepancies in the testimony on behalf of appellees and certain evidence offered by appellants which strongly supports their contention on the facts. This evidence does not rise to the dignity of undisputed physical facts so as to warrant this court in setting aside the verdicts. We do not try the issues *de novo* and under our established rule the verdicts must be upheld if, when viewed in the light most favorable to appellees, there is any substantial evidence to support the jury's determination of factual issues. Waters-Pierce Oil Co. v. Knisel, 79 Ark. 608, 96 S. W. 342; C. R. I. & P. Ry. Co. v. Manus, 193 Ark. 397, 100 S. W. 2d 258.

Appellants also contend that the evidence is insufficient to support the verdict because the statements of Braman were made while acting within the scope of his employment as manager of the store to an employee and were reasonably necessary under the circumstances and, therefore, qualifiedly privileged in the absence of express malice which, they insist, has not been shown. In

the recent case of Arkansas Associated Telephone Co. v. Blankenship, 211 Ark. 645, 201 S. W. 2d 1019, we said: "In the case of Sinclair Refining Co. v. Fuller, 190 Ark. 426, 79 S. W. 2d 736, this court approved the following statement from Newell, Slander and Libel, (Fourth Ed.) p. 450: 'A defamatory communication when necessary to protect one's own interest is privileged, when made to persons who also have a duty or interest in respect to the matter. In such case, however, it must appear that he was compelled to employ the words complained of. If he could have done all that his duty or interest demanded without libeling or slandering the plaintiff, the words are not privileged.' In the same case this court also approved the rule stated in 36 C. J., p. 1248, as follows: 'The protection of the privilege may be lost by the manner of its exercise, although the belief in the truth of the charge exists. The privilege does not protect any unnecessary defamation. In order for a communication to be privileged, the party making it must be careful to go no farther than his interest or his duties require. Where the party exceeds his privilege and the communication complained of goes beyond what the occasion demands that he should publish, and is unnecessarily defamatory of plaintiff, he will not be protected, and the fact that a duty, a common interest, or a confidential relation existed to a limited degree is not a defense, even though he acted in good faith.' "

Appellants rely on the case of Bohlinger v. Germainia Life Ins. Co., 100 Ark. 477, 140 S. W. 257, which involved libel. It was there said: "If the statements are published by one in good .faith to another in order to protect his own interest or to protect the corresponding interest of the other in the matter in which both parties are concerned, then such statements are privileged when the subject-matter of the publication makes it reasonably necessary under the circumstances to accomplish the purpose desired. Newell on Defamations, Slander and Libel, (2 Ed.) p. 388; 18 A. & E. Enc. Law, 1037; King v. Patterson, 49 N. J. Law, 419; Rotholtz v. Dunkle, 53 N. J. L. 428, 20 Atl. 193, 26 Am. St. Rep. 432, 13 L. R. A. 655; Holmes v. Clisby, 121 Gr. 241, 48 S. E. 934, 104

Am. St. Rep. 103; Montgomery v. Knox, 23 Fla. 595, 3 So. 211; Allen v. R. R. Co., 100 N. C. 397, 6 S. E. 105; Briggs v. Garrett, 111 Pa. 405, 2 Atl. 513, 56 Am. Rep. 274. But the communications containing defamatory statements thus made should not, in any event, go beyond what the occasion required. If it is shown by the writing itself, or by evidence outside of the communication, that the occasion therefor was abused, or that the statements were not relevant to or went beyond the subject-matter or purpose of the agency or business, or that the statements were made from malice proved, then no protection will arise against the prosecution of an action for libel, although there may exist a common interest or duty of the parties between whom the communication passes. Such intrinsic or extrinsic evidence would show a want of good faith, and would repel the inference that there was no malice . . . " The court further said that if, from the uncontroverted testimony, there is no malice shown, it then becomes the duty of the court to direct a verdict for the defendant.

In Gaines v. Belding, 56 Ark. 100, 19 S. W. 236, the court said: "Where the words spoken are actionable *per se, prima facie* the law implies malice, and the jury can award compensatory damages only, but cannot award exemplary or punitive damages, without proof of express malice. Whether there was express malice, was a question of fact for the jury. Malice may be shown by the defamatory words themselves and the manner of their publication, and need not be proven by extrinsic evidence. The absence of legal excuse for publishing the slander is evidence of malice. Express malice may be inferred from all the circumstances of the case, but it is not to be inferred from the facts alone that the words are false and injurious to the plaintiff, although an implication of malice arises from these facts that will warrant compensatory damages . . . Where actual ill will or express malice is shown, the jury may give exemplary or vindictive damages, the amount of which it is their province to determine, under proper instructions from the court." See, also, Stallings v. Whittaker, 55 Ark. 494, 18 S. W. 829; Newell, Slander & Libel (4th Ed.) § 277.

When the highly controverted testimony in the case at bar is considered in the light of the rules above announced, we think the questions whether Braman was acting in good faith or was actuated by actual malice in making the statements attributed to him by appellees, and whether he went beyond what his interest or duty required, were properly for the jury. On the whole case the evidence was substantial and sufficient to support the verdicts and the trial court did not err in refusing to direct verdicts for appellants.

When Mrs. Walthall testified that appellant Braman shook his finger at her and hit her on the nose so many times that a mark was left, appellants objected to the testimony on the ground that there was no allegation of physical violence in the complaint. The court limited the jury's consideration of this testimony to the issue of malice. Mrs. Walthall later testified to further instances of Braman laying rough hands on her without any objection to such testimony. While the complaints do not allege physical violence, they do allege malice. We think this evidence was competent for the limited purpose for which it was offered and that no error was committed in so admitting it.

Error is assigned in the refusal of the court to give appellants' requested Instruction No. 6 which would have told the jury as a matter of law that appellees were not entitled to punitive damages. Since we have previously indicated that there was sufficient evidence of express malice to go to the jury, there was no error in the refusal of this instruction.

It is next argued that the court erred in giving appellees' requested Instruction No. 1 because it did not require the jury to find publication of the slander. The instruction reads: "If you find from the preponderance of the evidence that the defendant Braman used the words set out in the complaint to the effect that the plaintiffs were guilty of a crime or crimes, then the plaintiffs are entitled to recover compensatory damages from both defendants unless you should further find from a preponderance of the evidence that plaintiffs were

guilty of the crime charged, or unless you find that the use of such words was privileged as hereinafter defined.''

The complaints of appellees alleged that the slanderous statements were used in the presence of appellees and other employees who were named. We find it unnecessary to determine whether the word ''used'' is synonymous with ''publish'' and its use, therefore, sufficient to meet the objection of appellants. While Braman testified that he asked appellees ''a thousand times'' to tell the truth, he did not deny that he accused them of taking property from the store or that he made statements to that effect in their presence. The evidence on behalf of appellees as to publication of the alleged slander appears to be uncontradicted and we have frequently held that it is not necessary to submit to the jury an issue established by undisputed evidence. Pacific Life Ins. Co. v. Walker, 67 Ark. 147, 53 S. W. 675; Aetna Life Ins. Co. v. Dewberry, 187 Ark. 278, 59 S. W. 2d 607; George v. George, 191 Ark. 799, 88 S. W. 2d 71.

In this connection the court gave appellees' requested Instruction No. 8, as follows: ''Publication of slander is the utterance of slanderous words whether in the presence of the person slandered and one or more other persons, or the utterance of such words to any other person or persons in the absence of the person slandered. It is not necessary that the slanderous words should be made known to the public generally, or even to a considerable number of persons. It would be sufficient publication if the slanderous words complained of were addressed to the plaintiff, Mrs. Walthall, in the presence of the plaintiff, Mrs. Allen, or were addressed to the plaintiff, Mrs. Allen, in the presence of the plaintiff, Mrs. Walthall.'' This instruction correctly states the rule set forth in 33 Am. Jur., Libel & Slander, § 96, as follows: ''It is not necessary in matters of libel or slander that the defamation be made known to the public generally, or even to a considerable number of persons. It is sufficient if it is communicated to only one person other than the person defamed, and such a publication suffices even though such person does not believe what is said of the

person defamed, at least when the words are uttered maliciously. It has been said that this is true because the injury to the reputation of the plaintiff is not the sole element of injury; the jury has a right to consider also the mental suffering of the person slandered. Another reason is that in the case of defamations which are actionable *per se,* injury is conclusively presumed.''

Appellants also contend that error was committed in the giving of appellees' requested Instruction No. 5 because it omitted the defense of privilege and did not require publication. This instruction dealt with burden of proof as to the truth of the slander and the presumption of good character, reputation and innocence of crime. It was not a binding instruction and is not open to the objections made. The defense of privilege was fully covered in other instructions given by the court.

It is finally insisted that the verdicts are excessive. The evidence on behalf of appellees was sufficient to show that they suffered physical illness, humiliation, mental anguish, embarrassment and loss of subsequent employment on account of the slanderous statements of appellant, Braman. It is true that the evidence in this connection is more favorable to Mrs. Walthall than to Mrs. Allen. Under our decisions we may not set aside the verdicts as being excessive unless we can say the jury was actuated by prejudice, passion or corruption in fixing the amount of damages. In the following cases verdicts were sustained for similar or greater amounts than in the instant case under facts somewhat similar to those presented here. Gaines v. Belding, supra; Safeway Stores, Inc. v. Rogers, 186 Ark. 826, 56 S. W. 2d 429; Sinclair Refining Co. v. Fuller, 190 Ark. 426, 79 S. W. 2d 736. We conclude that the verdicts are not excessive.

We find no prejudicial error in the record and the judgments are accordingly affirmed.

GRIFFIN SMITH, C. J., dissents.

GEORGE ROSE SMITH, J., not participating.

GRIFFIN SMITH, Chief Justice (dissenting). Insofar as abstract facts are concerned, the department

store's merchandising methods, and the administrative policies and customs in effect while appellees were employed, are fairly stated in appellant's brief. The majority opinion, pursuant to a judicial custom of stating the facts in a manner most favorable to conclusions reached by a jury, does not detail testimony the Blass Company has emphasized, nor are written confessions set out.

It is my view, therefore, that a clearer understanding of the controversy can be had by showing what the appellants relied upon, since good faith in making the investigation was claimed upon the one hand and denied upon the other.

The preliminary statement by Frank J. Wills, counsel for Don Braman and The Gus Blass Company, is copied. I think, first, that testimony did not preponderate in favor of the plaintiffs, and it became the trial Court's duty to set the verdicts aside. However, on review, we determine only whether there was substantial evidence of actionable misconduct. If in examining the appeal we are compelled to accept as substantial the wholly unreasonable and patently contradictory statements of appellees,—(and it must be remembered that as interested parties their testimony could not be treated as uncontradicted)—still, I think a rational construction of the investigations made by Braman is conclusive of the proposition that he meticulously refrained from giving unnecessary publicity to the transactions, and nothing not required by careful conduct was done to embarrass the parties.

The factual statement from appellants' standpoint is as follows:

"Abnormal inventory shortages had been evident in the Blass Co. piece goods department for more than a year. Appellee Walthall was cashier and appellee Allen was a saleslady in that department, each having been so employed for many months.

"Appellee Walthall, on September 26, 1947, admitted in writing that she had taken in excess of $14.00 in money and a large amount of merchandise from the store without payment. She went to her home with

Evelyn Cox and Margaret Beall where the merchandise was recovered.

"On September 26, 1947, appellee Allen admitted in writing that she had likewise taken a large amount of merchandise. She went to her home with Miss Cox and Mrs. Beall where the merchandise was found.

"A few weeks later, appellees filed separate suits for slander, alleging the Blass Company and Braman called them liars, thieves, cheats, and lying thieves while they were employees of the Blass Company.

"To appreciate how the matters leading to these causes arose, it is necessary to know the method of making cash sales at the Blass Company and the internal control thereof, which is as follows:

"1. Each cashier has a specific identifying mark which is stamped on each cash sales ticket handled. Mrs. Walthall's was a number "1" in a circle. Each cashier begins the day with a certain amount of "bank money" with which to make change.

"2. Separate cash sales books with specific identifying serial numbers on each sales slip therein are issued to salespersons, who must use the books charged to them.

"3. When making a cash sale, the salesperson uses the next consecutive numbered ticket in her book and shows: (a) Number of the department (b) Identifying number of the salesperson (c) The total amount of money or check received (d) Detail of items sold with the total amount of sale and tax.

"4. The salesperson herself, or a sales assistant, takes the merchandise, money and orginal sales ticket to the cashier, who stamps the ticket, puts the money in her separate cash box and makes change, puts the original ticket on her spindle and gives the salesperson a perforated portion of the ticket with the same identifying number thereon, which acts as a claim check. The cashier hands the merchandise to the bundle wrapper who delivers the wrapped merchandise in exchange for the claim check, which is to be held for 30 days.

"5. The sales audit department picks up from each cashier every hour or so during the day, all cash sales

tickets, checks the extensions and additions, sees that each ticket is accounted for in numerical order from each salesbook, and enters the total on a control sheet for each cashier. All errors in extension and addition must be okayed by the department head.

"6. At the end of the day, each cashier counts her cash, including her "bank money" and turns it in to the general offices on the fourth floor with her report. The next morning, the cash is verified by the general office with the report from each cashier, and the net amount of cash sales turned in to the general office should balance with the controls over each cashier that have been maintained by the sales audit department.

"7. Prior to the events that resulted in this litigation, the unused portions of sales books of salespersons who left the employ of the Blass Company were not checked in by the auditing department, but were left on a ledge near the cashier's desk.

"Appellee Walthall's cash for Monday, September 22, 1947, balanced. The next day it was short $25.87, but this shortage was not discovered until the following Thursday, the store having been closed for the intervening day.

"On Thursday, September 25, 1947, when the general office report of the net cash sales turned in by Mrs. Walthall was shy $25.87 of the sales audit control over her cash sales for Tuesday, an auditor telephoned her to ask if she had misplaced a check or money order, there having been a cash sale in her work for Tuesday for $25.87, which showed a check had been received in payment. Within a short time, Mrs. Walthall asked if the outage was on clerk No. 787 (Mrs. Viar). When told it was, she asked if her shortage was around $25.00. Up to this time, the auditor had not told her whether her cash was over or short, or the amount of the outage. Mrs. Walthall then told the auditor that clerk 787 had a sales book with two identically numbered tickets, and one of them should have been voided and must have gotten into her Tuesday's work in error. The auditor then asked her to get the customer's claim checks for

the two identically numbered sales tickets but was told neither of them could be found.

"On that Thursday morning, the sales audit department delivered to appellant Braman, sales ticket with printed number 2410-25 for $25.87 from Tuesday's business and ticket with hand-written number 2410-25 for $11.48 from Monday's business. Both tickets bore Mrs. Walthall's stamp with a number (1) in a circle. He called Mrs. Walthall to his office, showed her the tickets, and asked what she knew about them. She said the $25.87 ticket should have been voided because the customer was annoyed at the delay in getting her check okayed by the credit department and decided to take only the first item listed on the sales ticket, a new ticket for the lesser amount of $11.48 was made and the $25.87 ticket should have been voided.

"Having procured from clerk No. 787 the name and address of the $25.87 customer, Braman telephoned Mrs. Kontsonkos at Hot Springs and learned she had received all the merchandise for which she issued her check to the Blass Co. for $25.87.

"On Friday morning, when told the customer had taken the full $25.87 sale, Mrs. Walthall admitted that on the day of that sale, she had taken a ticket from a discarded sales book, torn off the printed number and substituted in pencil the number 2410-25, recorded a $11.48 sale, and had pocketed the difference of $14.39 to apply on a dentist bill for one of her children. She had intended to destroy the $25.87 ticket but it got into her work for Tuesday. Had she destroyed this $25.87 ticket, her cash would have balanced for Tuesday and this method of diverting sales receipts from the Blass Co. would not have been discovered. When it got into her work for Tuesday, she was short that day the exact amount of $25.87.

"When Mrs. Walthall said she was ready to tell the truth about the whole matter, Miss Cox was called to take her statement in shorthand, which was done in the presence of Margaret Beall. Braman went about his work and returned in about half an hour and had Miss

Cox read back her notes in the presence of Mrs. Walthall. He then asked a few questions which Mrs. Walthall answered, which were taken in shorthand by Miss Cox. Miss Cox then began transcribing her notes in an adjoining office.

"Mrs. Beall had brought to Braman's office, two tied up suit boxes full of things from Mrs. Walthall's desk. They contained some shoes, letters, and many pieces of merchandise. Of this merchandise, Mrs. Walthall said the black material was for a slip for herself and for Mrs. Allen, three pieces of blouse material were for herself, and she had intended to' take both boxes home with her.

"When Mrs. Walthall and Mrs. Beall returned from lunch, Miss Cox had completed transcribing her notes. The statement was handed to Mrs. Walthall who read it and then signed it in the presence of Braman, Miss Cox and Mrs. Beall. The substance of .the statement is as follows:

" 'I forged the ticket and pocketed the $14.59. About six months ago, Mrs. Allen and I began a plan whereby Mrs. Allen would cut off certain materials for herself and for me without making sales tickets or payments. I put the materials in sacks and delivered those of Mrs. Allen to her son, Jerry. I had secreted mine in a house package and have a box full at home I got that way. Of the goods I intended to take home today, the tan wollen was cut for me by Mrs. Allen about three weeks ago. The black silk material was cut by Mrs. Allen for herself only yesterday. Mrs. Allen intended to pay for the black tube dress. A refund had been written for the green dress but it did not go back in stock. The blue material was returned yesterday but I did not want it. I paid for the satin material and pattern on pay day; bought the shoes at the basement sale for $1.00; these items I intended to take home and the box of materials I have at home are all I have taken. The box at home contains some gingham, several pieces of blouse material and maybe a skirt.

" 'I never took any money from my cash box except on that one ticket No. 2410-25. It is all right for Mrs.

Beall to go to my home and bring back the merchandise. I have admittedly taken from the Blass Co.'

" 'A fuchia blouse has been made up for me but I bought the childrens' clothes in lay away. I will show you exactly what I have taken when you go to the house with me. I never gave anyone a piece of material over that desk except Mrs. Allen. The gross amount I have taken won't be $200.00.'

"When Mrs. Walthall arrived at her home with Miss Cox and Mrs. Beall, she went directly to her closet and handed them a box of materials she said she had taken from the store without payment. The list of these 12 items totaling $35.95 is at page 355.

"When they returned from Mrs. Walthall's home, Braman was interviewing Mrs. Allen. Mrs. Walthall was given some paper and asked to write another statement, which she did in the training room which is about three offices from Braman's. The original of this statement is at page 353 and the substance is as follows:

" 'About February, Mrs. Allen cut off some gingham and asked me to hold it for her and one of her kids would be up to take it out for her, which I did. She also cut some blouse material for me and the next time I bought something, I took the blouse material home in a house package. The material I have at home and what is in the desk is all I've had cut off.

" 'The other day I got a statement from the dentist saying he was turning my account over to the credit bureau if I didn't pay it. I got a ticket and made a duplicate, leaving off two items and took the $14.59 to pay the dentist. This is the first time I ever did this.'

"The substance of Mrs. Allen's statement which is wholly in her own handwriting, is as follows:

" 'For the past year and a half I have cut off materials for Myrna and myself but do not know how much. I also know Mrs. Lee carried out material for Myrna and cut it off for her, but I do not know how much. As far as I can recollect, the following is all I took. (7 items totaling $26.06 are then listed in detail.) During the

style show, a lot of material was taken from the department without any accounting.

" 'About the black material, Myrna said her mother would make each of us a slip and 3½ yards would make two slips, so I cut the 3½ yards off.'

"Mrs. Allen also agreed Miss Cox and Mrs. Beall could go to her home with her to get the materials she admittedly had taken without payment. Mrs. Allen did not return to the store when they brought back the 6 items totaling $26.00.

"Mrs. Allen went to her lawyer on Saturday, September 26, and never did go back to the Blass Co. to claim any of the materials recovered from her home.

"On that same Saturday, with her boy friend, Mr. Metrailer, and her brother, Vance Mason, Mrs. Walthall called on Braman. She was excited and her brother asked her and Metrailer to leave the office, so he could talk with Braman. Braman gave Mason the personal things his sister had packed in the two suit boxes, except the merchandise she had admitted belonged to the Blass Co. Braman told Mason he was turning the matter over to the bonding company, understood they did not want their mother to know about it, and it might be worked out by Mrs. Walthall paying a little every week on the shortage. Mason was to talk further with his sister and report back to Braman, but he did not return.

"After completing its independent investigation, the bonding company paid the Blass Co. a $2,500.00 settlement for the inventory shortages in the piece goods department.

"Appellees Walthall and Allen had various temporary jobs through the end of 1947. In the early part of 1948, Mrs. Walthall obtained a position with a bank in Little Rock and Mrs. Allen obtained one with U. S. Time Corporation. Both of them were so employed at the time of the trial at better jobs than they had with the Blass Co.

"Neither appellee denied signing the statements, but both testified they wrote only what Braman dictated.

They could not explain how Braman could describe the various pieces of materials referred to in their statements as being in their homes, nor could Mrs. Allen explain why she had given in her statement as one of the causes of the inventory shortages, her explanation that much unrecorded material was used in the style show. Over appellants' objections and exceptions, they were permitted to testify that Braman used physical force and violence to their persons while interviewing them, notwithstanding no allegations to that effect were contained in either complaint on the slander counts.

"Mrs. Whitehall testified she was called a liar and thief in the presence of Miss Cox, Mrs. Beall and another employee who was in and out of Braman's office. Mrs. Allen testified she was so slandered only in the presence of Mrs. Walthall and her character and reputation were not damaged thereby. Appellants' requests for a verdict in their favor in each case were denied over their objections and exceptions.

"Verdicts for $2,000 actual and $500 punitive damages to each of the appellees were signed by nine of the jurors."