GOODMAN *v.* PHILLIPS.

4-9337                                    235 S. W. 2d 537

Opinion delivered January 15, 1951.

*Eichenbaum, Walther & Scott,* for appellant.

*W. B. Howard,* for appellee.

HOLT, J. Appellee, Evelynea·Phillips, brought this suit against appellants to recover damages resulting from alleged slanderous words spoken about her, in her presence, and in the presence of· others. From a judgment rendered on a jury's verdict awarding her $1,000, compensatory damages, comes this appeal.

For reversal, appellants contend (1) that the evidence was not sufficient to support the verdict and (2) that the verdict was excessive.

— (1) —

Appellee alleged in her complaint ''that on the 13th day of December, 1948, plaintiff, while shopping in de-

fendants' place of business, purchased of and from defendants a lady's skirt, tendering as payment therefor a twenty-dollar federal reserve note; that said note was handed to M. Pulliam, a clerk of the defendants, Heinemanns, Inc.; that upon receipt of the note the said clerk caused the same to be transmitted to the defendant, Herbert Goodman, manager of the store. Upon receipt of the bill, the said Goodman summoned the city police, took the bill, and in the presence of his said clerk accosted plaintiff, exhibited said money to her and referring to same said: 'This is a bad bill, we have gotten hold of some more like it, I would know one any time I saw it;' that he (Goodman) then proceeded to interrogate plaintiff with numerous and embarrassing questions designed to cause plaintiff to admit that she had uttered the said bill with knowledge that it was counterfeit; . . . that as a result of investigation made by defendants, the said Goodman finally said, 'It is a good bill' and plaintiff was allowed to depart from defendant's store.

"That said false charge of uttering a counterfeit bill embarrassed and humiliated plaintiff, subjected her to great mental anguish, and caused plaintiff to become so overcome by nervousness that she was confined to her home for a period of two days and injured plaintiff's good name and reputation," etc.

Appellee went to appellants' mercantile store in Jonesboro, and after purchasing several items for which she paid cash, selected a skirt and offered to the clerk, Mrs. Anne Pulliam, a new $20 bill in payment.

As to subsequent events, appellee testified: "Q. She went to get your change? A. And she was gone a good bit before she came back, and when she came back she said 'I will have your change directly.' . . . Then she went back again and was gone a good while again, and when she came back Goodman was with her. . . . Q. All right, What did he (Goodman) do and say at the time, if anything, Mrs. Phillips? A. Well, he walked up to me and said 'this is a bad bill.' . . . And what else did he say? A. He said 'did you know you had the bill?' . . . I said, 'No, sir.' . . . Q. He said it

was a counterfeit bill? A. Yes, sir. Q. And he said you knew it was a counterfeit bill? A. He didn't say I knew it was. He said 'Did you know it was?' . . . Well, he said, 'Can't you think where you got the bill?' I said 'No, sir.' . . . I said, 'No, I can't. I will have to have time. I got two bills from my son. He got them from his dad. I suppose they came from the Bank of Trumann.' . . . He wanted to know if I had any more bills like that. I said 'I wouldn't know.' That I would look and see. . . . And I looked, and showed him two more bills. And he said 'No, you don't have any others like this one. This is a bad bill. I have gotten hold of some more like it.' . . . And he said 'I would know one from a good bill any time I would see it.' . . . 'I have heard there was counterfeit money out and I would like to find where it is coming from.' . . . He then turned away with the bill and walked off. . . . Then I told the lady, Mrs. Pulliam, 'It hurts me to have to stand and wait like this. I'm going to have to take a rest tablet.' . . . Well, I kept standing there a good while, and then I looked up and saw the policeman coming and Goodman was with him. . . . And it scared me when I saw him coming. . . . He was coming from the direction of his office. . . . The policeman walked up and said 'You're the one had the bill?' I said 'Yes, sir.' Q. 'You're the one that had the bill,' and you said you were? A. Yes, sir. And Goodman began showing him the bill. . . . He (Goodman) said 'You can tell this is a bad bill. The flag droops more than' the other, and the shrubbery is more than the other.' He said 'You can tell it is a bad bill by looking through the glass.' . . . Well, Goodman turned and walked away again. . . . Then the policeman said 'Are you willing to go to headquarters with me for further questioning and examination of the bill?' . . . And I said 'I suppose so.' About that time Goodman came back. He said 'I have called the bank and they said if it had either a 'G' or an 'H' on it, it is a good bill. He gave me the bill and disappeared. Then Mrs. Pulliam said 'I'm sorry to have held you so long.' A. And the policeman said 'I'm sorry, lady, this happened

this way, but it's my job to look into these things.'
. . . Q. Did you ever have anybody accuse you of
doing anything wrong before? A. No, sir. Q. And
that is the reason it scared, humiliated and embarrassed
you? A. Yes, sir. Q. After he told you it was a good
bill and the clerk apologized to you and the policeman
apologized to you, did you leave the store at that time?
A. Yes, sir.''

When we consider the above testimony in the light
most favorable to appellee, and the jury's verdict, as we
are required to do, (*Braman and The Gus Blass Company* v. *Walthall,* 215 Ark. 582, 225 S. W. 2d 342) we
hold that it was substantial and sufficient to warrant
the verdict.

Goodman's statement to appellee in the presence of
Mrs. Pulliam that the bill was ''bad,'' ''counterfeit,'' ''I
have gotten hold of some more like it . . . I would
know one from a good bill any time I would see it, I have
heard there was counterfeit money out and I would like
to find out where it is coming from,'' his query: ''Did
you know you had the bill?'', his action in calling the
police without appellee's knowledge, his statement to the
policeman in appellee's presence, after he came to the
store, that ''you can see this is a bad bill,'' and the
policeman's query ''Are you willing to go to headquarters with me for further questioning and examination of
the bill?'', all warranted the jury in finding that appellants' actions and conduct, in the circumstances, implied,
and were meant to charge Mrs. Phillips with knowingly
passing a counterfeit bill, a crime, and actionable *per se,*
when, in fact, the bill was perfectly good.

We held in *Dean* v. *Black & White Stores, Inc.,* 186
Ark. 667, 55 S. W. 2d 500, (Headnote 1): ''Under Crawford & Moses' Dig., § 2396, (Ark. Stats. 1947, § 41-2409,
page 136) providing that it is slander to charge one with
a crime, it is not necessary that the words themselves
show that a crime is charged; if it appears from the connection in which the charge was made, or from the circumstances attending its utterance that it intended or

understood to impute a crime, it will be regarded as actionable *per se.*''

In *Greer* v. *White,* 90 Ark. 117, 118 S. W. 258, this court said: ''Defamatory language must be interpreted as it would be understood by the reader or hearers, taking into consideration accompanying explanations and the surrounding circumstances which were known to the hearer or reader.'' 25 Cyc. 357. This implies that attending circumstances not known to the hearers are not to be considered in determining whether or not the words spoken are slanderous in themselves. It is immaterial what meaning the speaker really intended to convey by the language used if the words spoken are in fact slanderous, and in *Jackson* v. *Williams,* 92 Ark. 486, 123 S. W. 751, we find this language:

''As stated in 25 Cyc. 335, 'the rule now is that the words are to be taken in their plain and natural meaning, and to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used and the ideas they are adapted to convey to those who heard or read them.' ''

— (2) —

As to the excessiveness of the verdict, but little need be said. The rule is stated in *Gaines* v. *Belding,* 56 Ark. 100, 19 S. W. 236, as follows: ''The verdict of the jury in an action for slander will not be set aside for excessive damages unless there is some suspicion of unfair dealing, or unless the case be such as to furnish evidence of prejudice, partiality or corruption upon the part of the jury. 'The case must be very gross and the damages enormous to justify ordering a new trial on a question of damages.' ''

We cannot say, in the circumstances here, and guided by the above rule, that the verdict is excessive.

Accordingly, it is affirmed.