McMILLION *v.* ARMSTRONG.

5-3270                                           378 S. W. 2d 670

Opinion delivered May 11, 1964.

[Rehearing denied June 1, 1964.]

*Loftin & Howard,* by *E. H. Herrod,* for appellant.

*Wright, Lindsey, Jennings, Lester & Shults,* for appellee.

PAUL WARD, Associate Justice. This litigation grows out of certain alleged defamatory statements made by appellant, Dr. Stephen D. McMillion, about appellee, George V. Armstrong. The jury returned a verdict in

favor of appellee and against appellant in the amount of $5,000 compensatory damages and $500 punitive damages. On appeal the principal issue is whether or not appellant's statements were privileged. To clarify the issues later discussed we think it expedient to set out below certain undisputed background facts.

*Background.* The North Little Rock Airport is a subdivision of the North Little Rock City Government. The Airport is under the immediate control of a commission composed of five members. As of August 7, 1962, the members of the commission were W. F. Laman, Mayor; Harold Simons, Manager; Eddie Holland; S. W. (Bud) Bowker; and, C. F. Allen.

At times pertinent to this litigation the commission was considering the construction of an administrative building on the airport grounds, and Robert L. Moore, a contractor, was figuring with the commission on constructing said building. While Moore was attempting to confer with Simons and Armstrong he got the impression they were proposing some type of unethical deal and he reported the "deal" to appellant. Appellant in turn reported the alleged "deal" to the Mayor, the members of the commission, and his alderman.

*Pleadings.* Early in 1963 appellee and Harold Simons filed a complaint (and an amended complaint) charging appellant with making false and defamatory statements (on August 7, 1962) about Armstrong in words as follows:

"A contractor has been in touch with me and has told me that you tried to get some work done on your home and have the cost of the work included in the price charged to the City of North Little Rock for the airport administration building. I believe the man, and I know you did it. I will not serve on the airport commission with a man of your caliber, and either you are going to resign or I am."

It was also alleged that statements of import were made by appellant on other occasions and to other people,

and that such defamatory statements were calculated to cause, and did in fact cause, great injury to appellee's reputation. The complaint (and amended complaint) contained similar alleged statements by appellant against Simons, but Simons (for undisclosed reasons) later abandoned his part in the action.

To the above complaint appellant .entered a general denial, and also stated "that if any statements were made that referred to these plaintiffs in any manner, that the statements would be privileged communication and not subject to liability . . . [and] that if any statements were made they were the truth."

Judgment was entered in accord with the jury's verdict, and on appeal appellant relies on four separate grounds for a reversal. . However, under the view we take, it will be necesasry to discuss only one ground or point. It is our conclusion that the ·judgment must be reversed because of the error contained in Instruction Number I given by the trial court. The pertinent parts of the instruction read:

"You are instructed that as a matter of law that the communication involved in this action was not privileged, under all of the circumstances in evidence. Also, you are instructed that there is no evidence that would justify you in finding that the words spoken were true. Therefore, since there is no dispute as to the import of' the words spoken by Stephen D. McMillion, you are instructed that they are actionable per se, and George V. Armstrong is entitled to compensatory damages as a matter of law."

There are other portions of the instruction which need not be copied, but which may be referred to later.

At least two vices are apparent in the·court's instruction which calls for a reversal. They are: (a) the court usurped the function of the jury and; (b) it deprived appellant of the defense of good faith and conditional privilege.

(a) Assuming for the purpose of this opinion only, that it was incumbent upon appellant to show appellee proposed an unethical "deal", we think the testimony makes a jury question on that point. Since the jury has a right to accept or reject testimony, to believe or not to believe any witness, and to draw reasonable inferences, we refrain from setting out the testimony, but refer only to the portions favorable to appellant. Moore said he made two or three attempts to get the plans for the airport building from Simons, but that Simons failed to produce them—that finally Simons asked him to come to his house late one evening and get the plans — that when he arrived Simons did not produce the plans and showed no interest in them but pointed out certain work he wanted done on his house; then Simons (without any explanation) took him to appellee's home where he (Moore) presumed the plans were located — that when he got there appellee (who was introduced by Simons as a commissioner but who in fact was not) proceeded to show him what he wanted done to his house—that appellee asked no questions about price but said the gate would be open for him to come and go when he pleased. From these facts and circumstances he concluded Simons and appellee wanted him (in order to get the contract) to repair their houses without cost to them. Moore met with the other commissioners on August 6 and talked to them by phone on August 7 (1962) and each time stated he thought an unethical "deal" was being proposed—he stated each time he didn't remember what exact words were spoken but it all amounted to a "deal". In the case of *Thiel* v. *Dove*, 229 Ark. 601, 317 S. W. 2d 121, we said:

"On the other hand, it is clearly improper for the court to tell the jury that a specific fact in evidence is sufficient to support an inference of guilt, negligence, or the like. *Blankenship* v. *State, supra* [55 Ark. 244, 18 S. W. 54]; *Smith* v. *Jackson,* 133 Ark. 334, 202 S. W. 227; *Coca-Cola Bottling Co. of Southeast Arkansas* v. *Bell,* 194 Ark. 671, 109 S. W. 2d 115. It is for the jury to say whether the particular inference *should* be drawn

from all the proof in the case, and consequently the court comments on the weight of the evidence when it declares that a certain inference *may* be drawn from a specific fact.''

(b) In our opinion it was not necessary, however, for appellant to prove appellee actually proposed an unethical ''deal'' but only to show that he acted in good faith when he passed on to the other commissioners the information he had received from Moore. The record is replete with evidence that Moore meant for appellant to understand Armstrong was proposing an unethical ''deal''. He made this clear to appellant (and to three commissioners) at the meeting on August 6 and also (over the phone) to the same people and the Mayor on August 7. Also, there is ample testimony in the record from which the jury could find that appellant acted only in good faith and for the best interest of the city and the commission when he talked about this matter to others. In most instances he was seeking advice as to what action should be taken by him. It was not until he was advised by his fellow commissioners to do so that he confronted appellee with the charge (at a meeting of the Mayor and the commissioners) on the night of August 7. In addition, we find nothing in the record to indicate that appellant mentioned the matter to anyone except to the other commissioners (including the Mayor) and to the alderman of his own ward. It is established by the record that the council appoints the commission members.

Under the facts and circumstances outlined above it was for the jury (and not the court) to say whether appellant acted in good faith. If appellant did act in good faith, he had a conditional privilege to convey the information to those with whom he was associated in a common cause. Rest., Torts, § 596. In the case of *Bohlinger* v. *Germaina Life Insurance Company*, 100 Ark. 477, 140 S. W. 257, we said:

''A communication is held to be qualifiedly privileged when it is made in good faith upon any subject-matter in which the person making the communication

has an interest or in reference to which he has a duty, and to a person having a corresponding interest or duty, although it contains matter which, without such privilege, would be actionable.''

We recognize the possibility that appellant may have started out in good faith, but that he acted unreasonably later (in not apologizing to appellee) when he learned more about the facts, and thereby abused the conditional privilege which he enjoyed. However, that was also a matter for the jury and not for the court to decide. In *Thiel* v. *Dove, supra,* we also said:

"A conditionally privileged occasion is also abused if the speaker is motivated by malice rather than by the public interest that calls the privilege into being . . . We think the proof made the existence of malice a question for the jury."

See also Rest., Torts, § 599. It is true that in this case (and in said Instruction No. I) the court permitted the jury to find whether or not appellant acted with malice, and it is also true that the jury found he did act with malice. Those facts do not, however, cure the other errors in the instruction above pointed out. Had the jury found (if permitted to do so) that appellant was protected by a conditional privilege it might have found differently as to malice.

The judgment of the trial court is reversed and the cause is remanded for a new trial.

Reversed and remanded.

Harris, C.J., and Robinson and Holt, JJ., dissent.

Carleton Harris, Chief Justice (dissenting). I am not in accord with the conclusion by the majority that this case must be reversed because error was committed in giving to the jury Instruction No. I, and I very much disagree with the finding that there was sufficient evidence to submit to the jury the question of whether the words spoken were true. The sole testimony relating to

the contact between Colonel Armstrong and Robert L. Moore is as follows:

"Q. Now, Mr. Moore, can you tell the jury when you got out of the car and walked up to Mr. Armstrong's. who introduced you?

A. Mr. Simons introduced me to Col. Armstrong as a member of the Airport Commission.

Q. Did you *think* (my emphasis) at that time you were looking for building plans?

A. I thought we were going to the Airport Commissioner's house to get a set of plans for the building.

Q. Who told you that?

A. I wouldn't say that I was told. I wasn't told why we were going there but since I had gone to Harold's[1] house in the first place to look at the plans and he didn't show them to me there then I *assumed* (my emphasis) that we were going to Col. Armstrong's house to see the plans.

Q. When you got to Col. Armstrong's house what was said?

A. I was introduced to his wife and we went straight on out the glass doors to the back of the house to this sun deck or patio.

Q. What transpired when you got out there—

A. He said what I—

Q. Who said?

A. Col. Armstrong said 'what I wanted was to take this hand rail off' he said 'I will probably use it later on another patio at the foot of the steps.' He said, 'I want a roof built over it and I want it screened in and fixed to where it will be a screened in patio.

Q. Did he tell you what kind of roof he wanted you to use?

---

[1] Referring to Simons.

A. I asked him specifically. I said, 'What type structure are you talking about? I said, 'Do you want wolmanized lumber, something of a lifetime construction or do you want to go the cheaper route or what do you want do you want fiberglass room or do you want shingles?' and he said, 'I am leaving all that up to you.'

Q. Then, what did you do?

A. We went back through the house outside. He told us the side gate would be open that I could come and go and that if there was no one at home I could come and go and he went back in the house and we got in the car and left."

This is all that is revealed by the transcript as to any contact between Armstrong and Moore; in fact, Mr. Moore stated that this was the only time he had ever seen Colonel Armstrong. Based on prior conversations with Simons (which were properly held by the trial court to be inadmissible) and the fact that Colonel Armstrong did not ask what the repair work would cost, Moore decided that he was being propositioned to do the work free of charge to Armstrong, (apparently the latter would use his influence as a member of the Airport Commission to assist Moore in being awarded the contract for the work at the airport) and the private work for appellee would then be included in the bill to the city. Thereafter, Moore told Dr. McMillion, in effect, that appellee had tried to make a "deal" with him. This, then, is the sum total of the evidence upon which Dr. McMillion based his charge that appellee was dishonest, and appellant steadfastly refused to alter that opinion, although he had only met Armstrong, and knew nothing about him. One circumstance that makes the charge so "far-fetched" is that Armstrong *was not even a member of the Airport Commission at the time that Moore went to the Colonel's home.* The conversation at the home took place on April 19, 1962, and appellee became a member of the Airport Commission on May 10, 1962. In fact, the work was done on appellee's house by another contractor, and paid for, before Armstrong ever became a member of the Com-

mission. The record reflects a check given by Armstrong to J. C. Cartwright in the amount of $280.00 on *May 8, 1962*. I think it can be said, without fear of contradiction, that if Colonel Armstrong had been convicted of soliciting a bribe on the basis of the testimony offered in this case, every member of this court would unhesitatingly have voted to reverse such conviction because of a complete lack of evidence.

Considering the fact that McMillion made his accusation concerning appellee to other members of the Commission individually, before making it at the Commission meeting, I have some doubt that he was entitled to the defense of "conditional privilege," but even if entitled to that defense, it does not appear, under the circumstances, that the court's instruction was prejudicial. I should mention one of the general rules relating to privileged defamatory communications. In *Arkansas Associated Telephone Company* v. *Blankenship*, 211 Ark. 645, 201 S. W. 2d 1019, this court, quoting 36 C.J., Page 1248, stated:

" 'The protection of the privilege may be lost by the manner of its exercise, although the belief in the truth of the charge exists. The privilege does not protect any unnecessary defamation. In order for a communication to be privileged, the party making it must be careful to go no farther than his interest or his duties require. Where the party exceeds his privilege and the communication complained of goes beyond what the occasion demands that he should publish, and is unnecessarily defamatory of plaintiff, he will not be protected, and the fact that a duty, a common interest, or a confidential relation existed to a limited degree is not a defense, even though he acted in good faith.' "

In this state, the qualified or conditional privilege can be destroyed by malice, and the malice necessary to destroy a qualified privilege can, in addition to "malice in fact" (hate, vindictiveness, animosity) consist of such reckless disregard of the rights of another as to consti-

124

tute the equivalent of ill will. *Dun & Bradstreet, Inc., v. Robinson,* 233 Ark. 168, 345 S. W. 2d 34.

Let it be remembered that the jury was not compelled by the instruction in question to establish damages of $5,500.00. A verdict for $1.00, or other nominal amount, could have been returned, but, in addition to fixing the sum of $5,000.00 compensatory damages, the jury returned a verdict of $500.00 as punitive damages, and, in doing so, necessarily found that Dr. McMillion had acted *with malice.* This meant that the jury found either that McMillion's charge was wanton and reckless, or that he acted with actual malice. In *Erwin* v. *Milligan,* 188 Ark. 658, 67 S. W. 2d 592, this court said:

"The court submitted to the jury, in the case of Mrs. Milligan against the appellant, the question of punitive damages. *Punitive damages are damages imposed by way of punishment,*[2a] and are given for the loss sustained. It is generally said that punitive damages are awarded in view of the supposed aggravation of the injury to the feelings of the plaintiff by the *wanton or reckless act of the defendant.*"[2b]

The finding of the jury in the instant case is not difficult to understand under the testimony presented. Even after the meager evidence (to my way of thinking, no evidence) had been discussed in the Commission meeting, appellant refused to "back up," but continued to insist that, "I believe you did it," and, "I still think it happened." The doctor stated that he would not serve on the same commission with a man of Armstrong's character, and that Armstrong would resign or he would resign, and if he (appellant) resigned, he would make known what had happened. In fact, at the trial, the doctor stated that he still adhered to the view expressed.

Since the jury found malice to have existed, I cannot see how appellant was prejudiced by the instruction. The situation bears some similarity to our holding in *Weatherford* v. *George,* 229 Ark. 536, 317 S. W. 2d 147.

[2a], [2b] Emphasis supplied.

In that case, involving a collision between vehicles, the appellant was found by the jury to be 100% negligent, and appellee accordingly guilty of no negligence. On appeal to this court, appellant vigorously contended that the trial court had erred in not submitting a particular instruction that he requested, relative to appellee's negligence being the proximate cause of the accident. In rejecting this contention, we said:

"It certainly follows, that if the jury found George guilty of no negligence whatever, they would not have found that negligence on his part was the proximate cause of the mishap. Accordingly, even if the failure to give the instruction was error, the verdict rendered by the jury had the effect of healing or remission."

Under the same reasoning, even if appellant was entitled to have the defense of conditional privilege submitted to the jury, such defense could have been of no aid, for the jury found *malice*—and awarded punitive damages—and when the jury found malice, the asserted defense of conditional privilege was wiped out. Of course, this finding also nullified appellant's contention of "good faith," for irrespective of Dr. McMillion's belief in the truth of his accusation, the jury found, at the least, that he had acted with conscious indifference and reckless disregard of the rights of appellee.

Solomon, reputed to have been the wisest man who ever lived, said, "A good name is rather to be chosen than great riches . . ."[3]

Aside from the fact that to accuse a man of a specific act of dishonesty, or a crime, is slander *per se,* the record establishes that McMillion's charges raised doubts in the minds of some of his fellow commissioners as to appellee's integrity. For instance, Commissioner Bowker stated, "It makes anybody stop and think  *  *  * I am saying it makes you stop and wonder."

Commissioner Allen testified:

---

[3] Proverbs 22:1.

"It is hard for anybody to set here and hear accusations made or remarks made about anybody without being impressed one way or the other. As to whether that caused me to say right away, 'well I believe he is dishonest.' No. Did it put a doubt in my mind whether he could have done it. Yes, but now whether to say he was dishonest just like Mr. Bowker said it makes you stop . and think." * * *

"Q. The only reason you could possible have for thinking he did do it was that Dr. McMillion had accused him of doing it and Mr. Moore said Lt. Col. Armstrong permitted him to look at his house?

A. That is about it."

Eddie Holland, Chairman of the Airport Commission, in response to the question as to whether he had any reason to believe Colonel Armstrong to be a dishonest man, stated:

"No, sir. I have no reason other than what I heard Mr. Moore say and being connected with the Airport Commission I was impressed and I felt like the commission should do something about it. I felt it had happened."

The unfortunate aspect about an accusation that reflects upon one's character, is that, even if totally untrue, and perhaps not really believed by the recipients of the information, such remarks almost invariably leave a question in the minds of the hearers, and every time the accused person's name is mentioned, the accusation is remembered, and the mental reaction, consciously or subconsciously, is—"I wonder".

As stated, I cannot agree that there is any testimony that would substantiate the truth of the charge, and the finding of malice cured any defect that might have existed under the court's instruction.

I therefore respectfully dissent.

ROBINSON and HOLT, JJ., join in this dissent.