UNITED INSURANCE COMPANY OF AMERICA and
Mark Burcham *v*. Ann MURPHY

97-234 961 S.W.2d 752

Supreme Court of Arkansas
Opinion delivered February 12, 1998

[Petition for rehearing denied March 19, 1998.*]

---

\* CORBIN, J., would grant. NEWBERN, J., not participating.

*Butler, Hicky & Long*, by: *Fletcher Long, Jr.*; and *Williams & Anderson*, by: *Leon Holmes* and *Jeanne L. Seewald*, for appellants.

*Daggett, Van Dover, Donovan & Perry, PLLC*, by: *Jesse B. Daggett, Joe R. Perry*, and *J. Shane Baker*, for appellee.

W.H. "DUB" ARNOLD, Chief Justice. This is a defamation case. The appellants, United Insurance Company of America and Mark Burcham, appeal a judgment of the Crittenden County Circuit Court imposing an award of $600,000 in compensatory damages and $2,000,000 in punitive damages to appellee Ann Murphy for her slander claim. On appeal, the appellants contend that the trial court erred in instructing the jury that damages could be pre-

sumed and that they had the burden of proving that the alleged defamatory statements were true. They further maintain that the damage award is excessive and that the trial court improperly allowed hearsay evidence at trial. The appellee cross-appeals the trial court's remittitur of the jury's award of $3,000,000 in compensatory damages. While we are persuaded by appellants' argument that the doctrine of presumed damages should be abolished, we conclude that fairness dictates a prospective application of our holding. We find no merit in the parties' remaining arguments and affirm the trial court's judgment.

The appellee was employed by United as a sales representative in home solicitation sales. As an insurance agent, she sold and collected premiums for debit insurance to Arkansas customers in Lee, St. Francis, and Woodruff Counties. From October 1991 until her termination from the company on January 12, 1992, she was under the supervision of Burcham. In early 1992, Burcham began handling her accounts. During this time, he allegedly made defamatory statements to customers that appellee had stolen their premium payments.

The appellee filed a defamation complaint against the appellants seeking both compensatory and punitive damages for Burcham's statements. At trial, she offered her testimony along with testimony of her former customers. At the close of appellee's case in chief, the trial court directed a verdict on special damages. The case was submitted to the jury on a claim of slander *per se* with an instruction that placed the burden on the appellants to prove that the alleged slanderous statements were true. The trial court further instructed the jury that damages could be presumed in a slander *per se* action. The jury returned a verdict for the appellee, awarding $3,000,000 in compensatory damages and $2,000,000 in punitive damages, and the trial court entered a judgment accordingly. Thereafter, appellants filed a motion for judgment notwithstanding the verdict, or, alternatively, for new trial or remittitur. Following a hearing, the trial court entered an order remitting the compensatory damages award to $600,000, but denying appellants' remaining motions.

### 1. Presumed damages

One of the appellants' primary contentions on appeal is that the trial court erred in instructing the jury with regard to presumed damages. The instruction at issue provided as follows:

> However, you are instructed that there is a concept that the law calls slander per se. In such cases, a person slandered is entitled to compensatory damages as a matter of law, and such plaintiff is not required to introduce evidence of actual damages in order to recover compensatory damages. Therefore, if you find that Mark Burcham falsely accused Ann Murphy with being involved in criminal activity or which injured Ann Murphy in her trade, business, or profession, then Ann Murphy is not required to introduce evidence of actual damages in order to recover compensatory damages.

Specifically, the appellants ask that we follow the course of several other jurisdictions and abolish the doctrine of presumed damages in defamation cases. *See e.g., Taylor v. Chapman,* 927 S.W.2d 542 (Mo. App. 1996); *Walker v. Grand Cent. Sanitation,* 634 A.2d 237 (Penn. Super. 1993); *Ryan v. Herald Assn., Inc.,* 566 A.2d 1316 (Tenn. App. 1989); *Costello v. Capital Cities Comm., Inc.,* 505 N.E.2d 701 (Ill. App. 1987); *Marchiondo v. Brown,* 649 P.2d 462 (N.M. 1982).

The genesis of the doctrine of presumed damages can be traced back to the common law. Under the common law, defamation *per se* encompassed false statements that the plaintiff was guilty of a crime, afflicted with a loathsome disease, as well as false statements prejudicing the plaintiff's ability to engage in his or her profession. *See Minor v. Failla,* 329 Ark. 274, 946 S.W.2d 954 (1997); *Ewing v. Cargill,* 324 Ark. 217, 919 S.W.2d 507 (1996); *Reese v. Haywood,* 235 Ark. 442, 360 S.W.2d 488, 489 (1962); *Studdard v. Trucks,* 31 Ark. 726 (1877). In such cases, the plaintiff could recover compensatory damages without proof of actual damage to reputation. *Partin v. Meyer,* 277 Ark. 54, 639 S.W.2d 342 (1982); *Dunaway v. Troutt,* 232 Ark. 615, 339 S.W.2d 613 (1960); *see also* Howard W. Brill, *Arkansas Law of Damages,* § 33-9, at p.577 (3d ed. 1996) . In other words, damages were presumed from the nature of the defamation, as defamatory statements *per se* were considered injurious and sufficient to support an award of

special damages. *Dun & Bradstreet v. Robinson*, 233 Ark. 168, 345 S.W.2d 34 (1961); *Braham v. Walthall*, 215 Ark. 582, 225 S.W.2d 342 (1949); *see also* Howard W. Brill, *Arkansas Law of Damages*, § 33-9, at p.577 (3d ed. 1996). Where the statements were not actionable as defamation *per se*, the tort was considered defamation *per quod* and required a showing of special damages. *Ransopher v. Chapman*, 302 Ark. 480, 791 S.W.2d 686 (1990).

In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the United States Supreme Court held that, in cases involving media defendants, states may not allow recovery of presumed or punitive damages absent a showing of knowledge of falsity or reckless disregard of the truth on the part of the publisher. Absent malice, a private plaintiff is limited to recovering damages for actual injury, which included "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Id.* at 349. Thereafter, in *Little Rock Newspapers, Inc., v. Dodrill*, 281 Ark. 25, 660 S.W.2d 933 (1983), a case involving a private plaintiff and a media defendant, we adopted the requirement that, to recover damages in a defamation case, a private plaintiff must prove reputational injury:

> The law of defamation has always attempted to balance the tension between the individual's right to protect his reputation and the right of free speech. To totally change the character of defamation to allow recovery where there has been no loss of the former right, would be an unjustified infringement on the First Amendment.

*Id.* at 31. However, one year after our decision in *Dodrill*, the Supreme Court clarified in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985), that "permitting recovery of presumed and punitive damages absent a showing of 'actual malice" does not violate the First Amendment when the defamatory statements do not involve matters of public concern. *Id.* at 763.

Since 1985, the question of whether damages to reputation may not be presumed in cases against non-media defendants has remained an open one in our state. *See Hogue v. Ameron, Inc.*, 286 Ark. 481, 695 S.W.2d 373 (1985)(stating that the Gertz decision left open the question of whether the defamation per se concept

remained in the law with respect to actions against non-media defendants); and *Ransopher v. Chapman, supra* ("[W]e may entertain an argument in the future that the awarding of compensatory damages without proof of loss should not occur").

■ As the Supreme Court stated in *Gertz*, the presumed-damage rule in defamation cases is an oddity of tort law. *Gertz*, 418 U.S. at 349. As one commentator has ably described, "[a] number of evils flow from the anomaly of presumed damages." David A. Anderson, *Reputation, Compensation, and Proof*, 25 Wm. & Mary L. Rev. 747, 749 (1984). Among the problems inherent in presuming harm are the absence of criteria given to juries to measure the amount the injured party ought to recover, the danger of juries considering impermissible factors such as the defendant's wealth or unpopularity, and the lack of control on the part of trial judges over the size of jury verdicts. Anderson, *supra*, at 749-752. Moreover, by allowing presumed damages for certain words that fit within the *per se* categories but precluding actual damages for other words without additional proof of damages, the common law rule "creates unjustifiable inequities for plaintiffs and defendants alike." *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 313 (Mo. banc 1993). We believe that the better and more consistent rule, as set out in the *Dodrill* case, is to require plaintiffs to prove reputational injury in all cases. *See also Prosser & Keeton on the Law of Torts* §112, at p. 797 (5th ed. 1984)(stating that "courts should require as a minimum for recovery in every case either evidence from which harm to reputation could reasonably be inferred or direct evidence of harm to reputation.").

■ In the present case, as we will discuss in the following point, the appellee submitted proof of actual damage to her reputation. Under these circumstances, it would be unconscionable to require her to produce this same proof again at another trial. Thus, we conclude that fairness dictates a prospective application of our holding. *See Oliver v. State*, 323 Ark. 743, 918 S.W.2d 690 (1996); *Wiles v. Wiles*, 289 Ark. 340, 711 S.W.2d 789 (1986). From the date of this opinion forward, we hold that a plaintiff in a defamation case must prove reputational injury in order to recover damages. Accordingly, we overrule all prior decisions inconsistent with this opinion.

## 2. *Excessive damages/remittitur*

■ Appellants further maintain that the damages award is excessive. When an award of damages is alleged on appeal to be excessive, we review the proof and all reasonable inferences most favorably to the appellee and determine whether the verdict is so great as to shock our conscience or demonstrate passion or prejudice on the part of the jury. *Builder's Transp., Inc. v. Wilson*, 323 Ark. 327, 914 S.W.2d 742 (1996). In its order denying appellants' motion for new trial, the trial court found that appellee had proved actual damage to her reputation. We agree that this evidence justified the award as remitted by the trial court in the present case.

The appellee testified at trial that, after Burcham made the statements that she had stolen her customers' insurance premiums, she contemplated going to jail. She explained that her life was no longer the same, that she was "miserable," and that the entire experience had been a "nightmare." She described how people were now afraid to let her in their homes. The appellee's husband, Lonnie Murphy, testified that she was "hurt real bad" and was "real tore up" over Burcham's defamatory publications. He related that, after the incident, she would "sit around and cry" and had to take nerve pills and sleeping pills because she was so upset. According to Lonnie, their seven-year-old son did not understand these changes in his mother.

■ ■ The appellee also offered the testimony of several of her former customers. Florence Oglesby "could not say" that appellee still had a good reputation in the community. According to Oglesby, when appellee's name arises in conversation, "people still talk about what she's supposed to have done." Ruby Anthony testified that her reputation in the community had changed, as she is known as a "thief." Elizabeth Moie testified that Burcham's publication "really knocked on [appellee's] reputation." Carol Lindeman testified that, while appellee's previous reputation of truthfulness had been "tops" or "number one," Burcham's statements "really bothered" her and caused her to "lose faith" in appellee. According to Lindeman, after the statements were made, none of appellee's customers wanted to purchase insurance from her. Wilma Stennett testified that she believed the state-

ments that Burcham had made, that the statements changed her opinion of appellee, and that she tried to convince others that Burcham's statements were true. As to the argument on cross-appeal, remittitur is appropriate when the compensatory damages awarded cannot be sustained by the evidence. *Johnson v. Gilliland*, 320 Ark. 1, 896 S.W.2d 856 (1995). We agree with the trial court that, while the appellee's evidence of actual damages supported an award of $600,000, the jury's award of $3,000,000 in compensatory damages cannot be sustained by the evidence.

 Turning to the issue of punitive damages, when reviewing such an award, we consider the extent and enormity of the wrong, the intent of the party committing the wrong, all the circumstances, and the financial and social condition and standing of the erring party. *McLaughlin v. Cox*, 324 Ark. 361, 922 S.W.2d 327 (1996). Punitive damages are to be a penalty for conduct that is malicious or done with the deliberate intent to injure another. *Id.* When reviewing the testimony of appellee's former supervisor, Bobby Carey, the jury could have concluded that Burcham intentionally made the defamatory statements because he did not like to work with women and did not want appellee under his supervision. Moreover, when hearing the testimony of Jo Ann Scroggins, one of appellee's customers, the jury could have further concluded that an additional motive of Burcham's was to enlist appellee's customers as his own. Particularly, Scroggins testified that, when making the defamatory remarks, Burcham told her more than once, "I'm your next agent." Regarding United, there was evidence presented at trial that the company's officers knew that Burcham had made the defamatory statements, were aware that Burcham was not following company audit or documentation procedures to substantiate the allegations of theft, and did nothing to stop Burcham and even permitted him to terminate appellee on the basis of these faulty allegations. In light of this evidence, the jury could have concluded that appellants displayed a conscious indifference for appellee and that their acts were done with the deliberate intent to injure her. *See McLaughlin*, 324 Ark. at 371–372; *see also Ledbetter v. United Ins. Co.*, 845 F. Supp. 844 (M.D. Ala. 1994). In sum, when viewing the facts in this case, the amount of punitive damages does not shock our conscience.

Before leaving this point, we will not address appellants' constitutional argument, based on *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), that their due process rights were violated because they did not receive fair notice that they could be subject to such a severe penalty. They did not make this constitutional argument below; therefore, it is waived. *Sebastian Lake Pub. Util. v. Seb. Lake Rlty.*, 325 Ark. 85, 923 S.W.2d 860 (1996).

### 3. Burden of proof

Appellants further allege that the trial court erred in instructing the jury that they had the burden of proving that the alleged defamatory statements were true. The instruction at issue provided in pertinent part:

> If you find that any statements made by Mark Burcham were true then you are instructed that this is a defense to the defamation charge.
>
> Mark Burcham and United Insurance Company of America contend that any derogatory remarks about Ann Murphy were true. Mark Burcham and United Insurance Company of America have the burden of proving this contention.

In its order denying appellants' motion for new trial, the trial court acknowledged that appellants had objected to this instruction at trial. The appellee, however, disputes the fact that a proper objection was made. We need not decide whether an objection was made because it is clear that appellants failed to proffer an instruction containing what they saw as a correct statement of the law on the proper burden of proof on the issue of falsity. This failure to proffer or abstract a proposed instruction precludes us from considering appellants' argument on appeal. *Dixon v. State*, 327 Ark. 105, 937 S.W.2d 642 (1997); *Orsini v. State*, 281 Ark. 348, 665 S.W.2d 245 (1984), *cert. denied*, 469 U.S. 847 (1984).

### 4. Hearsay objection

Finally, appellants assert that the trial court erred in allowing the appellee's witnesses to testify that persons not called at trial said that Burcham said that the appellee was a thief. Appellants concede that we decided this issue adversely to them in *Wal-*

*Mart Stores, Inc. v. Dolph*, 308 Ark. 439, 825 S.W.2d 810 (1992). In that slander case, the plaintiff testified that her sister's mother-in-law had been told by one of the Wal-Mart employees that the plaintiff had been caught stealing. On appeal, we rejected Wal-Mart's hearsay argument, holding that the statement was not offered to prove the truth of what was said, but to prove *the fact* that it was said. *Id.* at 443. In making their hearsay argument in the present case, appellants ask us to overrule our decision in *Dolph*. We decline to do so.

Based on the foregoing, we affirm the decision of the trial court.

NEWBERN, J., not participating.

Special Justice THOMAS PRINCE, concurs.

GLAZE, CORBIN, and BROWN, JJ., dissent.

TOM GLAZE, Justice, dissenting. I join Justice Corbin's dissent, but add that, by today's decision, we change case law on "presumed injury" in this defamation suit that has been the rule in Arkansas since statehood. I believe we should have issued a caveat that the court intended to consider the soundness of the rule and the court's possible overruling it.

BROWN, J., joins this dissent.

DONALD L. CORBIN, Justice, dissenting. I concur with the ultimate result reached in this case, but I dissent from the majority's announced prospective rule that henceforth every plaintiff in every defamation case, whether or not the First Amendment is implicated, must prove reputational injury in order to recover damages. If the majority's decision means that plaintiffs must now prove actual loss in order to recover in a slander action, I strongly dissent.

The rationale behind the doctrine of presumed damages for slander per se is best illustrated by the dissent of Justice M. Steele Hays in *Lile v. Matthews*, 268 Ark. 980, 598 S.W.2d 755 (1980), wherein he wrote:

> The reasoning behind this cardinal principle of libel and slander is that some types of defamation are so clearly inimical to character,

reputation and regard of the person defamed that injury to that person's ability to earn a livelihood is presumed.

*Id.* at 989, 598 S.W.2d at 760.

Professor Prosser explains further:

> [T]here developed the rule that slander, in general, is not actionable unless actual damage is proved. To this the courts very early established certain specific exceptions: the imputation of crime, ... and those affecting the plaintiff in his business, trade, profession, office or calling — which required no proof of damage. The exact origin of these exceptions is in some doubt, but probably it was nothing more unusual than a recognition that by their nature such words were especially likely to cause pecuniary, or "temporal," rather than "spiritual" loss. . . . For these four kinds of slander, no proof of any actual harm to reputation or any other damage is required for the recovery of either nominal or substantial damages. Otherwise stated, proof of the defamation itself is considered to establish the existence of some damages, and the jury is permitted, without other evidence, to estimate their amount. [Footnotes omitted.]

W. PAGE KEETON, PROSSER & KEETON ON THE LAW OF TORTS, § 112, at 788 (5th ed. 1984).

Chief Justice Carleton Harris answered the question of exactly what harm is caused by slanderous words, such as those used by Appellants in the case before us, when he wrote in his dissent in *McMillion v. Armstrong*, 238 Ark. 115, 378 S.W.2d 670 (1964):

> The unfortunate aspect about an accusation that reflects upon one's character, is that, even if totally untrue, and perhaps not really believed by the recipients of the information, such remarks almost invariably leave a question in the minds of the hearers, and every time the accused person's name is mentioned, the accusation is remembered, and the mental reaction, consciously or subconsciously, is — "I wonder."

*Id.* at 126, 378 S.W.2d at 676.

Appellee requested that we examine the decision of the Maryland Court of Appeals in *Hearst Corp. v. Hughes*, 466 A.2d 486 (Md. 1983). In doing so, I came to the inescapable conclu-

sion that our long-established case law, stretching over more than a century, is just as important to present-day defamation law, due to the difficulty faced by all plaintiffs in proving the damage to their reputations caused by the slanderous remarks. The following observations by the Maryland court should be as persuasive to this court as they were to the Maryland majority:

> We are directed by Hearst to the recent decision of the Supreme Court of Kansas in *Gobin v. Globe Publishing Co.*, 232 Kan. 1, 649 P.2d 1239, 1243 (1982), where that court adopted the rule that "[u]nless injury to reputation is shown, [a] plaintiff has not established a valid claim for defamation. . . ." This approach, in our view, fails to respect the centuries of human experience which led to a presumption of harm flowing from words actionable per se. One reason for that common law position was the difficulty a defamation plaintiff has in proving harm to reputation. *Eaton, supra,* at 1357 describes the problems:
>
> > *The conclusive presumption of injury for certain kinds of defamation derives from the recognition that injury to reputation is extremely difficult to demonstrate, even when it is obvious that serious harm has resulted. Identifying and locating those persons in the community who may think less highly of the plaintiff because of the publication is difficult, especially when the defamatory statement has been indiscriminately circulated. And once located, it is the rare witness who will admit to the plaintiff or testify in court that his attitudes toward the plaintiff have changed as a result of the publication, when by doing so he admits that he changed his opinion without determining the truth or falsity of the statement.*
>
> Ordinarily, the plaintiff will be able to present witnesses who will testify only that the plaintiff's reputation has been good, that their own opinion of the plaintiff has not changed, but that the plaintiff's general reputation in the community has suffered as a result of the publication. This kind of testimony often lacks credibility because it is bottomed on hearsay and imputes to others a change in attitude which the witnesses themselves thought unnecessary. And this kind of evidence is usually insufficient to establish the necessary causal connection between the defamatory publication and the alleged decline in community standing. In short, a requirement of actual proof of injury to reputation

> has always been thought to reduce considerably any chance for adequate compensation. [Footnote omitted.]

*Id.* at 495 (emphasis added).

The facts in the instant case bring the importance of the Maryland court's rationale into perspective. Here, the Appellants made much of the fact that Appellee's witnesses testified that their opinions of Appellee had not changed after Appellants had made the accusations that she had stolen from them. This is precisely the reason why the doctrine of presumed damages remains a viable, workable, and necessary facet of common law. This is also why the great majority of the states still cling to the concept of presumed damages, at least in some areas of defamation law. To do what the majority has prospectively done today will do nothing short of gutting our law of defamation, leaving our citizens no real recourse against those who would unjustly accuse them of heinous acts.

Furthermore, I cannot accept the majority's reasoning that a number of evils flow from presumed damages, namely the absence of criteria for juries to measure the amount the injured party should recover, the danger that juries will consider impermissible factors such as the defendant's wealth or unpopularity, and the lack of control that trial judges will have over the size of jury verdicts. The reason I cannot accept this rationale is that even with the rule announced today, there is no real criteria with which juries may measure the damage to a person's reputation in terms of dollars and cents. Moreover, instructing juries as to the concept of presumed damages is no less a guide in determining the amount of an award than are claims of outrage, mental anguish, or emotional suffering. The only way to adequately provide a measuring stick to juries for damages is to require that all damage to any plaintiff in any cause of action must be capable of being reduced to an exact dollar amount. Undeniably, such a requirement would be preposterous. The majority's reliance on such alleged problems caused by presumed damages is just as preposterous. Furthermore, the danger that there will be impermissible considerations of a defendant's wealth or unpopularity in assessing damages is present in every civil action tried before a jury, as are concerns that a trial judge will not be able to control the size of the verdicts.

Additionally, I take issue with the majority's reasoning that by allowing presumed damages for certain words that fit within the defamation per se category, but "precluding actual damages for other words without additional proof of damages, the common law rule 'creates unjustifiable inequities for plaintiffs and defendants alike.'" The reason for distinguishing certain types of defamation is based upon the gravity of the words said; to call someone a criminal or to say that he or she is crooked in his or her business dealings, trade, or profession is so injurious to that person that damage to his or her reputation can clearly be presumed. To require those persons to prove actual injury to their reputations is tantamount to abolishing the tort of defamation altogether. This I am unwilling to do, and I respectfully dissent.

GLAZE and BROWN, JJ., join in this dissent.