NORTHPORT HEALTH SERVICES, INC., and Kristy L. Unkel *v.* Diane OWENS and Alisa Main

03-678 158 S.W.3d 164

Supreme Court of Arkansas
Opinion delivered April 8, 2004

*Friday, Eldredge & Clark*, by: *Michael S. Moore*, for appellants.

*Benson, Robinson & Wood*, by: *Brian Wood*; and *Kincaid, Horne & Daniels*, by: *Shawn Daniels*, for appellees.

R OBERT L. BROWN, Justice. This is an appeal from a judgment in favor of appellees Diane Owens and Alisa Main and against appellants Northport Health Services, Inc., and Kristy L. Unkel. The judgment specifies that (1) Diane Owens was entitled to judgment against Northport and Unkel for $67,740 for wrongful termination and $200,000 for defamation; and (2) Alisa Main was entitled to judgment against Northport and Unkel for $65,000 for defamation. Northport and Unkel raise the following points on appeal: (1) they are entitled to judgment as a matter of law on the defamation claims, because there was no substantial evidence that actionable defamation occurred or that either Owens or Main suffered damage to their reputations; (2) the evidence was insufficient to support any award of damages to Owens or Main on their defamation claims; (3) Northport is entitled to judgment as a matter of law on Owens' claim of wrongful discharge; and (4) the verdict amount in favor of Owens on her wrongful-discharge claim is excessive and against the clear weight of the evidence. We affirm.

Diane Owens and Alisa Main are licensed practical nurses. Owens worked for Northport from March 1999 to April 2000. Main was also employed by Northport in 2000 and worked there

until she was terminated in April 2000. Northport is an Alabama corporation that owns nursing homes. One of its facilities is Fayetteville Health and Rehabilitation (Fayetteville Health) located in Fayetteville. At all times relevant to this case, Unkel was director of nursing at Fayetteville Health.

During her tenure at the nursing home and prior to April 2000, Owens complained about the nursing care of several certified nurse assistants. She made her complaints directly to Unkel as her superior. Main also complained about the abuse and neglect of the residents to Unkel. At trial, Unkel admitted she had received complaints about the nursing care from both Owens and Main. Prior to April 21, 2000, Owens testified that she complained to the Office of Long-Term Care about the abuse and neglect at Fayetteville Health.

On February 2, 2000, at least six certified nurse assistants (CNAs) wrote a three-page letter to the nursing home administrator at the time, Ralph Johnson, in which they complained about Owens and the difficult work environment she created, including the fact that she asked the CNAs to do tasks they were not licensed to do. In April 2000, there were three incidents where the CNAs complained that Owens and Main had abused or neglected the nursing home residents. On April 5, 2000, Garnette Jones, an Alzheimer patient, allegedly fell from her bed. One CNA allegedly saw Owens observe the incident and fail to fill out an incident report for the fall. However, Owens was not listed on the sign-in sheet for work on that day. Throughout the following two weeks, Ms. Jones complained of hip pain. She was transported to Washington Regional Medical Center and diagnosed with a hip fracture.

Alisa Main was accused of two incidents. On April 12, 2000, she was accused of failing to give a resident, Peggy Neff, her medication. However, one CNA making the allegation, Erika Crabtree, was not listed on the sign-in sheet as working that day. And on April 14, 2000, she was said to have told a resident, Lydia Davis, to "sit the fuck down."

Following the overnight shift which ended at 6:00 a.m. on April 21, 2000, seven or eight CNAs met with Unkel and assistant director of nursing, Dawna Wilder, for breakfast at a local restaurant and told them that Owens had failed to document Ms. Jones's fall and that Main had used foul language toward a resident and had failed to administer medications to another.

Later that morning, Unkel and Wilder met with Ken Waldele, the current administrator of the nursing home, to discuss the CNAs' complaints against Owens and Main. Wilder and Unkel then searched the nursing home records to determine whether Owens had documented the fall or whether anyone had documented Main's behavior. Unkel and Wilder found nothing in the nursing home records. At 5:00 p.m. that same day, Wilder and Unkel met again with the administrator. Wilder testified at trial that this was when the administrator instructed them to report the suspected abuse to the Office of Long-Term Care and the Fayetteville Police Department. The timing of the report, however, is disputed by the evidence.[1] Owens and Main were suspended from work at the nursing home. On April 24, 2000, they were fired.

On May 23, 2001, Owens and Main sued Northport and Unkel and alleged, among other causes of action, wrongful termination and defamation. They prayed for back pay and benefits; reinstatement to their former positions or front pay and benefits; compensatory damages for humiliation, emotional and mental distress, physical injury, damage to reputation, and intentional infliction of emotional distress; and punitive damages. Northport and Unkel answered and pled the affirmative defenses of immunity and good faith, that Owens and Main were at-will employees, and that the defamation claim should be dismissed for failure to prove actual injury to reputation.

Northport and Unkel then moved for summary judgment against Owens and Main and asserted the defense of qualified immunity. The motions were not pursued, and the appellants obtained no ruling from the circuit court.

The matter was tried to a jury over four days. At the trial, Owens and Main presented testimony that Owens had made abuse complaints against various CNAs before the complaints were made against her in April 2000; that nurses' notes were missing from the nursing home files from March 6 to April 16, 2000; that April 2000 acuity reports and incident reports were also missing; that Diane Owens was not listed on the nurse's sign-in sheet for April 5, 2000,

---

[1] Unkel testified that they made the reports *before* talking to Waldele. Wilder testified that they reported at 5:00 p.m., after conducting an investigation and giving the results to Waldele, who then ordered them to report. The Fayetteville police reports have 11:50 a.m. as the time of the reports by Wilder. The Office of Long-Term Care has 12:00 p.m. as the time of the reports by Unkel.

when she supposedly failed to chart Ms. Jones's fall, and that the nursing home knew that complaint was false; and that Erika Crabtree did not sign her name to a sign-in sheet for April 14, 2000, when she complained that Main had verbally abused a patient.

At the conclusion of Owens's and Main's case, Northport and Unkel moved for a directed verdict on the basis that it had qualified immunity from such a lawsuit and that good faith was presumed. They further contended that Owens and Main were at-will employees. The circuit court denied the motions and ruled similarly when the motions were renewed at the close of all the evidence.

■ The case was submitted to the jury on eighteen special interrogatories, and the jury returned all verdicts in favor of Owens and Main. Judgment was subsequently entered and damages awarded as previously related in this opinion. Northport and Unkel appealed to the court of appeals, and the judgment was affirmed. *See Northport Health Servs., Inc. v. Owens*, 82 Ark. App. 355, 107 S.W.3d 889 (2003). On the issue of Northport's and Unkel's qualified immunity, the court of appeals held that the appellants had waived this defense by not obtaining a ruling from the circuit court on their summary-judgment motions and by not appealing a denial of their motions by interlocutory appeal to an appellate court. Northport and Unkel next petitioned this court for review, which we granted. When we grant review, we treat the matter as if the appeal were originally filed in this court. *See, e.g., Hisaw v. State Farm Mut. Auto Ins. Co.*, 353 Ark. 668, 122 S.W.3d 1 (2003).

## I. Defamation

### a. Qualified Immunity

We first address Northport's and Unkel's claim that they were required to report abuse under Arkansas law and, thus, were entitled to qualified immunity for all such reports. They argue that they preserved their immunity defense both before and during the trial and that the court of appeals simply erred as a matter of law in holding that they waived this defense by not obtaining a ruling on their summary-judgment motions or appealing the issue by interlocutory appeal to an appellate court. They add that affirming any judgment in favor of Owens and Main would undercut the

statutory immunity and have a chilling effect on reports of abuse and neglect by health care providers.

■ We agree with Northport and Unkel that they preserved the issue of qualified immunity. According to the court of appeals, our cases have required that any denial of a motion for summary judgment on the issue of qualified immunity must be appealed by interlocutory appeal or be waived. The court of appeals relied in particular on *Ozarks Unltd. Resources Coop., Inc. v. Daniels*, 333 Ark. 214, 969 S.W.2d 169 (1998), and *Robinson v. Beaumont*, 291 Ark. 477, 725 S.W.2d 839 (1987). We disagree with the court of appeals' ruling that either case mandates an interlocutory appeal. Rather, both cases provide that an interlocutory appeal *may* be pursued in the event that a summary-judgment motion based on qualified immunity is denied.

■ In the case at hand, motions based on statutory immunity were filed by Northport and Unkel but not pursued. Nonetheless, Northport and Unkel raised the defense of qualified immunity in their answers to the complaint and in their directed-verdict motions at trial. We hold that the defense was preserved for purposes of appeal, and we modify the opinion of the court of appeals (*Northport Health Servs., Inc. v. Owens*, 82 Ark. App. 355, 107 S.W.3d 889 (2003)), on this point.

### b. Good Faith

Northport and Unkel next claim that not only were they immune from suit when they reported Owens and Main for abuse and neglect, but Arkansas law presumes their reports were made in good faith. They argue that there was no proof at the time they made their reports that they knew the reports were false and that Arkansas law does not require them to test the veracity of the reports before making them. Indeed, they contend that that would run counter to the requirement that the reporting be immediate.

The Omnibus Long-Term Care Reform Act of 1988, now codified at Ark. Code Ann. §§ 20-10-1001—20-10-1010 (Repl. 2000 & Supp. 2003), was enacted by the General Assembly to "provide protection for those citizens residing in long-term care facilities to assure the residents the highest quality of life while protecting their health and welfare." Ark. Code Ann. § 20-10-1002 (Repl. 2000). The protection of long-term care facility residents is governed by Act 1181 of 1999, now codified at Ark. Code Ann. §§ 20-10-1201—20-10-1209 (Repl. 2000 & Supp.

2003). Under this subchapter, every licensed facility must keep full records on all residents, including medical records and records of their personal and social history. *See* Ark. Code Ann. § 20-10-1203(8)(A) (Repl. 2000). Long-term care residents have specific rights under Act 1181, which include entitlement to adequate and appropriate health care and protective and support services. *See* Ark. Code Ann. § 20-10-1204(a)(8) (Repl. 2000). Act 1181 also grants immunity from civil liability to persons who complain about a violation of a resident's rights "unless that person has acted in bad faith or with malicious purpose." Ark. Code Ann. § 20-10-1204(d) (Repl. 2000).

Abuse and neglect of adults is also a criminal offense and is governed by our Criminal Code. *See* Ark. Code Ann. §§ 5-28-101—5-28-310 (Repl. 1997 & Supp. 2003). The reporting of adult abuse is covered specifically under Ark. Code Ann. §§ 5-28-201—5-28-221 (Repl. 1997 & Supp. 2003). Section 5-28-203 of that subchapter deals with people who are required to report abuse and states the following:

> (a)(1) Whenever any ... facility administrator, [or] employee in a facility, ... has reasonable cause to suspect that an adult has been subjected to conditions or circumstances which would reasonably result in abuse, neglect, or exploitation, as defined in this chapter, he shall immediately report or cause a report to be made in accordance with the provisions of this section.

> (2) Whenever a person is required to report under this chapter in his capacity as a member of the staff, [or] an employee in a facility, ... he shall immediately notify the person in charge of the institution, facility, or agency, or his designated agent, who shall then become responsible for making a report or cause a report to be made.

> \* \* \* \* \*

> (b)(1) ....

> (2) A report for abused or neglected adults residing in a long-term care facility shall be made immediately to the local law enforcement agency for the jurisdiction in which the facility is located, and to the Office of Long-Term Care of the Division of Economic and Medical Services of the Department of Human Services pursuant to regulations of that office.

(3) The Office of Long-Term Care shall notify the central registry and the office of the Attorney General.

Ark. Code Ann. § 5-28-203(a)(1)–(2) & (b)(2)–(3) (Repl. 1997).

Under the Criminal Code, immunity from liability and suit is also provided for those reporting, if the report is made in good faith:·

(a) Any person, official, or institution participating in good faith in the making of a report, the taking of photographs, or the removal of an abused adult pursuant to this chapter shall have immunity from liability and suit for damages, civil or criminal, that otherwise might result by reason of such actions.

(b) The good faith of any person required to report cases of adult abuse, sexual abuse, or neglect shall be presumed.

Ark. Code Ann. § 5-28-215 (Repl. 1997).

The question before us is whether Northport and Unkel acted in good faith when reporting their complaints about Owens and Main. In one of the special interrogatories posed to the jury, the jury found that Northport's publication of claims of abuse by Owens and Main was not made in good faith. We, therefore, must examine whether substantial evidence supported this verdict by the jury. *See, e.g., Advocat, Inc. v. Sauer,* 353 Ark. 29, 111 S.W.3d 346 (2003).

Testimony at trial revealed that Northport was on notice by April 17, 2000, that Ms. Jones had fallen from her bed and suffered a hip fracture. Northport also knew that Owens was a very detail-oriented person and had thoroughly filled out incident-report forms in the past. Northport knew that sign-in sheets for April 5, 2000, did not show Owens working on the day of the alleged fall and that sign-in sheets did not show that Erika Crabtree was working on April 14, 2000, the day that Main, according to Crabtree, allegedly abused one resident verbally. The jury was also made aware that pertinent documents were missing from the Fayetteville Health files and that only a few employees of the nursing home had access to those files, including Dawna Wilder and Kristy Unkel. Finally, Northport never took statements from Main or Owens in connection with the claims made against them.

From the evidence, the jury could reasonably have concluded, without resorting to suspicion or conjecture, that Northport acted in bad faith when making its report to the Office

of Long-Term Care and to the Fayetteville Police Department, and, thus, waived its qualified immunity under § 5-28-215.

### c. Damage to Reputation

 Northport argues that it is entitled to judgment as a matter of law on Owens's and Main's defamation claims, because there was insufficient evidence presented at trial of actionable defamation. This court recently set out the elements for defamation:

> A viable action for defamation turns on whether the communication or publication tends or is reasonably calculated to cause harm to another's reputation. The following elements must be proved to support a claim of defamation, whether it be by the spoken word (slander) or the written word (libel): (1) the defamatory nature of the statement of fact; (2) that statement's identification of or reference to the plaintiff; (3) publication of the statement by the defendant; (4) the defendant's fault in the publication; (5) the statement's falsity; and (6) damages.

> The allegedly defamatory statement must also imply an assertion of an objective verifiable fact. In order to determine whether a statement may be viewed as implying an assertion of fact, the following factors must be weighed: (1) whether the author used figurative or hyperbolic language that would negate the impression that he or she was seriously asserting or implying a fact; (2) whether the general tenor of the publication negates this impression; and (3) whether the published assertion is susceptible of being proved true or false.

*Faulkner v. Arkansas Children's Hosp.*, 347 Ark. 941, 955-56, 69 S.W.3d 393, 402-03 (2002) (internal citations omitted).

 Northport and Unkel primarily contend that Owens and Main failed to offer evidence showing that they suffered damage to their reputations resulting from any defamatory publication. Both parties cite this court to *Ellis v. Price*, 337 Ark. 542, 990 S.W.2d 543 (1999), as authority for proving damages in a defamation case. In *Ellis*, the appellee filed a complaint against two individuals who had accused her of adultery when she was three-months pregnant. She alleged that the assertion was defamatory and specifically had defamed her reputation in the eyes of her husband. The jury found in favor of appellee and assessed damages for $80,000, which comprised compensatory and punitive damages. We said:

> A plaintiff must establish actual damage to his reputation, but the showing of harm is slight. A plaintiff must prove that the defamatory statement(s) have been communicated to others and that the statements have detrimentally affected those relations. The law does not require proof of actual out-of-pocket expenses.

*Ellis*, 337 Ark. at 549-50, 990 S.W.2d at 547 (internal citations omitted). After examining the testimony presented at trial, we held that substantial evidence existed that the appellee's reputation in the eyes of her husband had been harmed.

Our case of *Hogue v. Ameron, Inc.*, 286 Ark. 481, 695 S.W.2d 373 (1985), is also on point. In *Hogue*, appellant, a state trooper, sued appellee for defamation after appellee wrote to the director of the state police complaining that appellant had driven an unlicensed vehicle and had yelled obscenities at him. The circuit judge granted a directed verdict in appellee's favor, because appellant failed to prove damages. This court reversed and remanded, because the evidence presented at trial constituted "some evidence of injury to [appellant's] reputation, and it was enough to get that issue to the jury," relying on appellant's own testimony and of one other witness that appellant's reputation had been harmed by the ensuing investigation of the incident. *Hogue*, 286 Ark. at 483, 695 S.W.2d at 374.

In the case at bar, Owens and Main testified that it was difficult for them to obtain comparable employment after reports were made to the Office of Long-Term Care and the Fayetteville Police Department of their abuse and neglect of patients. Linda Millspaugh, a registered nurse who runs a consulting business that provides assistance and consultation services to nursing home facilities, was called as an expert witness on behalf of Owens and Main to testify to this very point. Ms. Millspaugh testified that she would not hire someone at a nursing home who had been reported for adult abuse or neglect. The jury in this case found by a preponderance of the evidence that the defamation had been published and that publication of defamatory statements proximately caused Owens and Main damages. We hold that the testimony of Owens, Main, and Linda Millspaugh constituted substantial evidence and supported a finding of publication and damage to reputations.

## II. Remittitur for Defamation

Northport and Unkel next contend that, if the judgment on liability for defamation stands, the evidence was insufficient to support the damage awards of $200,000 (Owens) and $65,000 (Main), because no one witness testified that either Owens's or Main's reputation changed or was damaged in connection with any third party. Thus, they claim the damage awards are too high, and remittitur is proper and appropriate under *United Ins. Co. of America v. Murphy*, 331 Ark. 364, 961 S.W.2d 752 (1998). More specifically, they argue that the $65,000 awarded to Main was excessive, because she obtained employment as a licensed practical nurse immediately after her termination by Northport and because she failed to link her alleged emotional injuries to the publication of defamation. Moreover, according to the appellants, the damages for Main should be reduced to $10,000.

In addition, they maintain that the $200,000 awarded to Owens was excessive, because she voluntarily chose to make herself unavailable for any nursing jobs in the nursing-home industry apart from geriatrics and because she failed to link any emotional damage to the publication. Similarly, they contend that the damages awarded to Owens should be reduced to $10,000.

██ This court has looked to two factors in assessing whether compensatory damages are excessive and a remittitur is warranted. *See Union Pacific R.R. Co. v. Barber*, 356 Ark. 268, 149 S.W.3d 325 (2004); *Advocat, Inc. v. Sauer*, 353 Ark. 29, 111 S.W.3d 346 (2003); *United Ins. Co. of America v. Murphy*, 331 Ark. 364, 961 S.W.2d 752 (1998); *Builder's Transp., Inc. v. Wilson*, 323 Ark. 327, 914 S.W.2d 742 (1996). We examine whether the damages are excessive and appear to have been awarded under the influence of passion or prejudice under Ark. R. Civ. P. 59(a)(4) and, secondly, whether the award shocks the conscience of this court. *See id.*

██ In the instant case, the jury heard evidence that the CNAs and Northport had a motive to report Owens and Main for abuse and neglect, because Owens and Main were in the process of reporting them to the Office of Long-Term Care. It heard evidence that while claims were made against Owens and Main for abuse and neglect, they could not be substantiated by the facility's records. It heard evidence that many pertinent records were missing from the nursing home's files. And it heard evidence that both women had difficulty obtaining comparable nursing positions

as a result of the defamation. The jury was privy to the base pay and experience of Owens and Main and could calculate appropriate damages in connection with the defamation. We hold that the appellants have failed to establish either that the damage awards were excessive and the result of passion or prejudice or that they shock the conscience of this court.

### III. Wrongful Discharge

Northport and Unkel next urge that Owens's wrongful-discharge judgment was in error, because she was an at-will employee and her actions do not fall within the public-policy exception to the at-will employee doctrine created in Sterling Drug, Inc. v. Oxford, 294 Ark. 239, 743 S.W.2d 380 (1988), and M.B.M. Co. v. Counce, 268 Ark. 269, 596 S.W.2d 681 (1980). Specifically, they contend that Owens's intra-office complaints cannot form the basis of a claim of wrongful discharge, because she failed to show that Northport held any animus toward her before her termination. As a corollary point, Northport contends that Owens failed to mitigate her damages by seeking substantially equivalent employment, as required in Sellers v. Delgado College, 902 F.2d 1189 (5th Cir. 1990) (citing Ford Motor Co. v. EEOC, 458 U.S. 219 (1982)).

Owens counters that she was a "whistleblower" and that she had reported abuse and neglect perpetrated by the CNAs at the nursing home to her superior, Kristy Unkel. This was what she was required to do under §§ 5-28-203, 20-10-1002, 20-10-1003(b), and 20-10-1007(a). Moreover, she claims that her "whistle-blower" status places her squarely within the public-policy exception to the at-will doctrine. See Sterling Drug, Inc. v. Oxford, supra; M.B.M. Co. v. Counce, supra.

The Sterling Drug case seems especially pertinent to the case at hand. There, an at-will employee (appellee) filed suit against his former employer (appellant) for wrongful discharge, alleging that the appellant had forced the appellee's resignation because appellee had reported appellant to the General Services Administration for submitting false information during GSA contract negotiations. The jury returned a general verdict for appellee for $201,700 in compensatory damages and for $150,000 for punitive damages. In recognizing the public-policy exception to the employment-at-will doctrine, we said:

> an at-will employee has a cause of action for wrongful discharge if he or she is fired in violation of a well-established public policy of

the state. This is a limited exception to the employment-at-will doctrine. It is not meant to protect merely private or proprietary interests.

294 Ark. at 249, 743 S.W.2d at 385. We continued by saying that "the public policy of the state is contravened if an employer discharged an employee for reporting a violation of state or federal law." 294 Ark. at 250, 743 S.W.2d at 386. This court then examined the testimony presented at trial and concluded that sufficient evidence was presented to show that the appellant engaged in a continuous campaign to force appellee's resignation, because the appellant believed that the appellee had reported it to the GSA for pricing violations. Based on this evidence, we held that the verdict was substantially supported by the evidence.

The Long-Term Care Act clearly establishes the State's public policy of protecting adults in long-term care facilities from abuse and neglect. As part of the Act, Owens was required to make a report if she suspected that an adult at the nursing home had been abused or neglected. Testimony at trial revealed that Owens had made several complaints to Unkel about the CNAs and their treatment of the nursing home residents; that she had made a similar complaint to the Office of Long-Term Care; that the CNAs about whom Owens complained met with Unkel and her assistant for four hours and compiled complaints against Owens; that there was no documentation to back up these complaints, which means the jury could have believed that they were made in bad faith; that residents had never complained about Owens; and that she was a detail-oriented person with twenty-seven years of nursing experience.

We hold that substantial evidence existed that Owens was wrongfully terminated in retaliation for her complaints against the CNAs in the nursing home and, thus, in violation of the public policy of this state.

## IV. Remittitur for Wrongful Discharge

Northport argues that the $67,740 verdict on Owens's wrongful-discharge claim should be vacated, or, in the alternative, remitted to at most $10,000, because she failed to mitigate her damages by seeking other employment as a nurse in a field other than geriatrics. Owens testified at trial that she had promised

herself and her deceased grandmother that she would only work in geriatrics. For that reason, she eschewed other nursing jobs, other than home care.

Owens responds that the verdict amount for her wrongful-discharge claim was not excessive and not against the clear weight of the evidence, because the amount was calculated by economist Don Market as the amount of lost earnings and benefits sustained from the date of her termination until the time of trial minus any earnings made by her since her termination by Northport. She adds that the jury was instructed on the law based on this formula. Owens further urges that the extent of mitigation of damages is a jury question under *Harris Const. Co. v. Powers,* 262 Ark. 96, 554 S.W.2d 332 (1977), and that Northport and Unkel failed to carry their burden to show that Owens failed to mitigate. She points to evidence that she mitigated her losses by starting a cleaning business and doing some home healthcare. She added in her testimony that it would have been extremely difficult to find a job in the nursing business for geriatrics after Northport's wrongful termination and defamation.

■■ Owens correctly states the measure of damages. In the *Sterling Drug* case, this court first stated the measure of damages in a public-policy wrongful-discharge action:

> the sum of lost wages from termination until the day of trial less the sum of any wages that the employee actually earned or could have earned with reasonable diligence is the general measure of damages in a public policy wrongful discharge action. In addition, an employee can recover for any other tangible employment benefit lost as a result of the termination. Future damages are not recoverable.

294 Ark. at 251-52, 743 S.W.2d at 386-87. In the instant case, the jury was correctly instructed on the law, and it found in its special verdicts that Owens was wrongfully discharged in violation of the State's public policy and that she had suffered damages for wrongful termination amounting to $67,740. We disagree that this damage award is the proper subject of remittitur, and we affirm the circuit court.

Circuit court affirmed.

Court of appeals affirmed as modified.