# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-2445
_____

Dr. Melanie Jones

*Plaintiff - Appellant*

v.

Wellpath, LLC

*Defendant - Appellee*
_____

Appeal from United States District Court
for the Eastern District of Arkansas
_____

Submitted: January 11, 2023
Filed: August 8, 2023
_____

Before GRASZ, MELLOY, and KOBES, Circuit Judges.
_____

GRASZ, Circuit Judge.

Dr. Melanie Jones is a physician who provided medical care to Arkansas correctional facility inmates through her employer, Wellpath, LLC. Wellpath terminated Dr. Jones's employment, and she sued Wellpath, claiming it unlawfully terminated her employment because she reported suspected alterations to her

electronic patient medical records. The district court[1] granted Wellpath's motion for summary judgment. Dr. Jones appeals, and we affirm.

## I. Background

Wellpath contracts with jails and prisons across the country to staff them with medical professionals and provide medical services. In 2014, Wellpath obtained a contract to provide medical services to inmates housed in Arkansas detention facilities. To maintain Arkansas inmates' electronic patient records, Wellpath's medical providers used an electronic medical record system, eOMIS, provided by the Arkansas Department of Corrections ("ADC"). This electronic record system could be accessed by Wellpath's medical providers, ADC, and the software's development company, Marquis.

Dr. Jones, who had already been serving the Arkansas correctional system under Wellpath's predecessor, was hired by Wellpath after the company obtained its Arkansas contract. Though the name of Dr. Jones's employer changed, she continued to serve forty-eight hours per week at two facilities. This schedule increased by another ten hours when Dr. Jones began working at a third detention facility in 2019, taking her regular schedule up to fifty-eight hours per week.

Wellpath had both a clinical management team for medical decisions and an operational management team for administrative directions. Clinically, Dr. Jones reported directly to Dr. Jeff Stieve. During her time at Wellpath, Dr. Jones received positive peer reviews for her clinical ability. Indeed, on August 29, 2020, Dr. Stieve conducted an annual clinical care review, giving Dr. Jones an overall positive performance evaluation. Operationally, Dr. Jones reported to a facility health services administrator, who in turn reported to a Wellpath regional manager. Vesta Blanks was Dr. Jones's health service administrator, and Rebekah Davis was Blanks's regional manager.

---

[1]The Honorable Brian S. Miller, United States District Judge for the Eastern District of Arkansas.

In early 2020, the world experienced the outbreak of the COVID-19 pandemic. Wellpath administrators developed COVID response plans in alignment with the needs of each facility. Given the unique requirements of providing medical care in correctional facilities, Wellpath developed a response plan with security in mind. The plan included coordinating schedules among ADC staff, inmates' movements, medical providers' hours, and quarantine guidelines. Though in 2020 Dr. Jones was the only Wellpath physician assigned to the units she served, Wellpath scheduled nursing staff 24/7 to help perform inmate medical care and wellness checks twice a day, and to ensure medical coverage overnight. Despite the availability of around-the-clock nurses, Dr. Jones believed her presence was required overnight to provide adequate care. Dr. Jones worked whenever and as much as she thought was necessary. She routinely worked eighty to ninety hours per week, working, as she testified in her deposition, "half or more" of her contracted facility hours from home.

As the COVID pandemic continued, Wellpath adjusted their response plan for more sustainable operational approaches. Wellpath began this transition sometime around July 2020. Whether or not Dr. Jones was previously granted wide operational freedom, it is clear from an email sent from Blanks to Dr. Jones on July 27, 2020, this was no longer permissible. Beginning on July 27 at the latest, Wellpath began requiring Dr. Jones to conform to standard operational procedures: working predictable hours that would coincide with the schedules of the facilities' health service administrator and warden; complying with ADC's biometric facility-access policy, the use of which documented healthcare providers' working locations and hours and enabled Wellpath to report where and when its medical providers were performing services; and ceasing performing medical duties specifically assigned to nursing staff so Dr. Jones could focus on clinical duties. But Dr. Jones largely ignored Wellpath's directives.[2] Among other things, she continued to work night shifts and insisted she would work even more hours if she thought it was necessary.

---

[2] We do not take sides on factual disputes when reviewing an appeal from summary judgment. The occurrence of the issues involving Dr. Jones's noncompliance with her supervisors' instructions, discussed herein, is undisputed.

Before the first full week of August had passed, Dr. Jones's supervisors addressed her at least three times within nine days regarding her disregard for Wellpath's operational plan.

Throughout the end of July and into early August, Dr. Jones's supervisors also increasingly began dealing with issues involving Dr. Jones's interactions with inmates and other Wellpath providers. Multiple grievances were filed against Dr. Jones. On August 4, Blanks emailed Dr. Jones regarding a grievance claiming Dr. Jones communicated harshly with inmates and that she explicitly blamed her disposition on being awake for thirty hours straight. Another grievance alleged Dr. Jones was passing out medications to inmates when that was a task assigned to the nurses. In a separate incident on August 6, Dr. Jones and a Wellpath director of nursing, Farbergé Jones, conflicted over medication distribution, eventually taking their discussion into Nurse Jones's office. Though Nurse Jones told Dr. Jones twice to leave her office, Dr. Jones refused. Nurse Jones then called Blanks, who deescalated the situation via speaker phone. In response to this incident, Regional Manager Davis collected statements from Dr. Jones, Nurse Jones, Blanks, and four other witnesses, and reported the incident to human resources.

The day following Dr. Jones's incident with Nurse Jones, on August 7, Dr. Jones noticed a patient's electronic medical record in eOMIS had, in her belief, been altered. Dr. Jones reported her concerns regarding the alteration to Wellpath's regional information technology director. Working jointly with ADC and software developer Marquis, Wellpath began investigating Dr. Jones's concerns. Dr. Jones later contacted the FBI to report concerns that her personal email account had been accessed. Ultimately, the FBI recommended Dr. Jones hire a private investigator. At the time of her deposition, she had not done so. Wellpath's Information Security Team completed its joint investigation on or about October 7. Wellpath was unable to confirm any unusual eOMIS activity indicative of abnormal alterations. On October 26, Wellpath's chief compliance officer told Dr. Jones in email the investigation was complete, and the conclusion was that neither Dr. Jones's

computer nor her electronic medical record documentation had been tampered with. In early November 2020, Wellpath terminated Dr. Jones's employment.

Dr. Jones sued Wellpath in Arkansas state court, alleging wrongful termination, practicing medicine without a license, outrage, and identity theft. Wellpath removed the case to federal court based on diversity jurisdiction. *See* 28 U.S.C. §§ 1332 and 1441. The district court granted Wellpath's motion to dismiss Dr. Jones's original four claims but permitted Dr. Jones to amend her complaint and to assert a whistle blower claim, which Arkansas has recognized as providing a cause of action for wrongful termination in violation of public policy. *See Sterling Drug, Inc. v. Oxford*, 743 S.W.2d 380, 385–86 (Ark. 1988). After Dr. Jones filed her amended complaint, Wellpath again moved to dismiss for failure to state a claim. The district court denied the motion on the grounds that Dr. Jones's amended complaint pled facts sufficient for a wrongful termination claim, and the parties completed discovery. Wellpath then moved for summary judgment. The district court granted the motion, reasoning that Dr. Jones: (1) failed to establish her conduct fell within the public policy exception to at-will employment because she had not reported illegal activity on the part of Wellpath; and (2) failed to establish a causal connection between her reports of data alterations and her termination.

## II. Discussion

Dr. Jones appeals, arguing the district court incorrectly interpreted Arkansas law regarding what constitutes legally protected conduct under the public policy exception to at-will employment and improperly determined at the summary judgment stage that Dr. Jones failed to establish a causal link between her tampering reports and her termination. "A federal court sitting in diversity applies state substantive and federal procedural law." *Miller v. Honkamp Krueger Fin. Servs., Inc.*, 9 F.4th 1011, 1016 (8th Cir. 2021). The parties agree the substantive law of Arkansas governs this action. Accordingly, our application of that law is bound by the decisions of the Arkansas Supreme Court. *See Stuart C. Irby Co. v. Tipton*, 796 F.3d 918, 922 (8th Cir. 2015).

This court reviews de novo a district court's decision to grant summary judgment. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the initial burden of establishing the basis for the motion by identifying "those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Torgerson*, 643 F.3d at 1042 (cleaned up) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once that burden is met, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). If a genuine dispute exists as to a material fact, the "facts must be viewed in the light most favorable to the nonmoving party." *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)). But, "[m]ere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007); *accord Torgerson*, 643 F.3d at 1042.

Under Arkansas's employment-at-will doctrine, employers may generally discharge employees whose employment is for an indefinite term "for good cause, no cause, or even a morally wrong cause." *Smith v. Am. Greetings Corp.*, 804 S.W.2d 683, 684 (Ark. 1991). Arkansas recognizes a limited exception to this doctrine providing a cause of action to an at-will employee "for wrongful discharge if he or she is fired in violation of a well-established public policy of the State." *Island v. Buena Vista Resort*, 103 S.W.3d 671, 679 (Ark. 2003). Such a public policy must be outlined in the Arkansas statutes. *Id.* "The burden of establishing a prima facie case of wrongful discharge is upon the employee, but once the employee has met his burden, the burden shifts to the employer to prove that there was a legitimate, nonretaliatory reason for the discharge." *City of Huntington v. Mikles*, 240 S.W.3d 138, 143 (Ark. Ct. App. 2006).

Arkansas courts have addressed two requirements necessary to successfully bring suit under a public policy wrongful termination claim. First, the claimant must "identify a specific well-established public policy" sufficient to legally protect the claimant's conduct. *Jenkins v. Mercy Hosp. Rogers*, 633 S.W.3d 758, 765 (Ark. 2021). Second, the claimant must also establish by substantial evidence that the defendant fired the claimant because of the claimant's legally protected conduct. *See, e.g.*, *Island*, 103 S.W.3d at 680 ("[W]e hold that if she was terminated for refusing [her employer's] sexual propositions, appellant has a valid cause of action for wrongful termination."); *see also Moyer v. DVA Renal Healthcare, Inc.*, 368 F. App'x 714, 717 (8th Cir. 2010) (unpublished) ("A prima facie case of wrongful discharge for violation of public policy requires substantial evidence that discrimination or retaliation was the reason for the discharge."). "Substantial evidence is evidence of 'sufficient force and character to compel a conclusion one way or the other with reasonable certainty and must force the mind to pass beyond mere suspicion or conjecture.'" *Johnson v. Windstream Commc'ns, Inc.*, 545 S.W.3d 234, 240 (Ark. Ct. App. 2018) (quoting *Schubert v. Target Stores, Inc.*, 369 S.W.3d 717, 719 (Ark. 2010)) (reviewing a directed verdict on an ADA retaliation claim). Summary judgment is appropriate when a plaintiff fails to satisfy either element. *See, e.g., Lynn v. Wal–Mart Stores, Inc.*, 280 S.W.3d 574, 579–80 (Ark. Ct. App. 2008).

Having moved for summary judgment, Wellpath produced uncontested evidence "demonstrat[ing] the absence of a genuine issue of material fact" as to the validity of its reasons for terminating Dr. Jones. *See Torgerson*, 643 F.3d at 1042 (quoting *Celotex*, 477 U.S. at 323). Wellpath says it fired Dr. Jones because she "create[d] disharmony and discord that led to a lack of trust and confidence in her work, and for her repeated failure to keep her standard working hours." Def.'s Resps. to Pl.'s First Set of Interrog. at 3 ¶ 1. The undisputed evidence shows Dr. Jones clashed with others and openly undermined her superiors' authority in a series of escalating disputes before reporting any concerns regarding patient chart alterations. First, email records show that by July 27, 2020, Wellpath management had begun confronting Dr. Jones with concerns over the hours she worked. In the

July 27 email, Blanks expressed appreciation for Dr. Jones's past hard work and indicated the goal was for Dr. Jones's schedule "to return to normal"—a statement Dr. Jones testified to understanding as meaning working daytime hours. According to Dr. Jones, in their initial discussion about her hours, Blanks also told Dr. Jones to work on-site and during the day because that coincided with Blanks's schedule and was when most ADC staff would be on site. However, Dr. Jones refused to comply. Blanks followed-up, defining the specific hours Dr. Jones was expected to work in an email to Dr. Jones dated July 31 and again in an email dated August 4. But Dr. Jones disregarded the orders by working night shifts and not showing up for portions of daytime hours for which Dr. Jones was scheduled. This insistence on doing things her own way, contrary to Wellpath's operational plan, escalated for weeks. In an email dated September 28, Dr. Jones explicitly refused to comply with Wellpath's schedule.

Second, in Blanks's email dated July 27, and continuing until her termination, Dr. Jones was instructed to conform with ADC's policy and use ADC's biometric reader when entering and exiting the criminal correction facilities. Dr. Jones does not claim she made any effort to follow procedure. She instead attempted to justify her failure to comply. According to Dr. Jones, the biometric reader required ADC staff to activate the reader to use it. She attempted to justify her noncompliance by pointing out that she continued to work off-site and at all hours—when ADC staff was not around to pull it up for her. In essence, she argued compliance with the biometric instruction would not be possible because of her other refusal to follow the instruction to work on-site during daytime hours.

Third, Dr. Jones's disregard for the COVID response plan developed by Wellpath operational management infringed on the ability of other Wellpath employees to provide their assigned medical duties.[3] For example, on or about

---

[3]Though Dr. Jones responded to this claim in her response to the Statement of Undisputed Material Facts by stating "Denied," she has not "come forward with 'specific facts showing that there is a genuine issue,'" as to this claim or done "more

August 4, 2020, a Wellpath nurse filed a grievance against Dr. Jones. The grievance involved concerns over Dr. Jones's noncompliance with operational processes and medication distribution policies. Blanks handled the noncompliance as it caused confusion about what care had been provided, what was still needed, and whose duty it was to complete it. She talked to Dr. Jones about the grievance and laid out Wellpath's policy, but only a few days later, Dr. Jones and Nurse Jones had their conflict over medication distribution. Dr. Jones's refusals to follow Wellpath's instructions continued after Dr. Jones reported her record alteration suspicions, even as an increasing number of supervisors were brought in to address her insistent noncompliance. In sum, there is no dispute that Dr. Jones's behavior created conflict with management before she reported concerns about alterations to medical records, and this conflict escalated until she was terminated.

Dr. Jones fails to show anything beyond mere speculation or her own conclusory allegations that call into question the legitimacy of Wellpath's stated cause for her termination. *See Torgerson*, 643 F.3d at 1042. Dr. Jones argues the record reasonably supports an inference that Wellpath management raised the issues discussed above with Dr. Jones as excuses manufactured in retaliation for her reports of suspected patient chart alterations. She relies in part on the close temporal proximity between her report filed on August 7 and her termination occurring in early November. She also points to *Northport Health Services, Inc. v. Owens*, 158 S.W.3d 164 (Ark. 2004), to claim her good clinical performance history, in combination with the close temporal proximity, indicates a causal link between her reporting and her termination. We are unconvinced.

In *Northport*, the employer appealed a jury verdict entered in favor of the claimant on her wrongful discharge claim, arguing the judgment was in error because the employer was entitled to judgment as a matter of law. 158 S.W.3d at 167. The employer argued the employee's actions "did not fall within the public-

---

than simply show[ing] that there is some metaphysical doubt" regarding this statement. *See Torgerson*, 643 F.3d at 1042 (quoting *Celotex*, 477 U.S. at 323).

policy exception to the at-will employee doctrine." *Id.* at 173. The Arkansas Supreme Court considered the claimant's good past work performance, the timing of events, and the questionable veracity of the presented evidence of workplace issues and determined the claimant showed a question existed for a jury determination. *Id.* at 173–74. But distinguishable from the facts presented here, the claimant's supervisors had no job performance issues related to the claimant *before* she filed her reports alleging abuse and neglect of nursing home residents, an act the court determined was legally protected by Arkansas's public policy. *See id.* at 174.

Dr. Jones's argument overlooks the critical distinction between her claim and the facts of *Northport*: timing. Her argument fails to account for the fact her negative dealings with her employer began *before* she made reports and *continued* until her position was terminated. Nothing more than her own speculation supports her claim the reason for her job termination was manufactured to hide an illegal reason.

In sum, Dr. Jones failed to show a genuine issue of material fact exists as to the causation element required for a public policy wrongful termination cause of action. Reasonable minds could not believe an employer would see into the future and begin preemptively generating evidence to support an impermissible basis for terminating a whistleblower-to-be. Simply because Dr. Jones reported suspected suspicious electronic activity while Wellpath administrators labored to resolve ongoing employment disputes does not abrogate Wellpath's broad right to terminate her at-will employment under Arkansas law. *See Lynn*, 280 S.W.3d at 576–77; *see also Smith*, 804 S.W.2d at 684 (discussing Arkansas's broad at-will employment doctrine). With no genuine issues existing as to the causation element of the Arkansas public policy wrongful termination exception, her claim fails as a matter of law.[4] Thus, the district court appropriately granted Wellpath's motion for summary judgment.

_____

[4]Because we find the district court correctly determined Dr. Jones failed to establish the requisite causation element necessary to submit a public-policy wrongful termination claim to a jury, we need not reach the question of whether

## III. Conclusion

We affirm the district court's judgment.

_____

Dr. Jones's activity was protected conduct under Arkansas law, and we express no opinion as to the correctness of the district court's interpretation of Arkansas law on that question.